COLUMBIA NAT. BANK OF TACOMA et al. v. MATHEWS.

(Circuit Court of Appeals, Ninth Circuit. February 7, 1898.)

No. 380.

1. NATIONAL BANKS—INCREASE OF STOCK—CONCLUSIVENESS OF COMPTROLLER'S CERTIFICATE.

The certificate of the comptroller of the currency that the capital stock of a bank has been increased to a certain amount is conclusive of the sufficiency of the facts and the regularity of the proceedings requisite to an increase, and cannot be questioned in any collateral proceeding.

2. SAME—SUBSCRIPTIONS—ESTOPPEL.

One who subscribes to a proposed increase of stock with knowledge that the stockholders had by a resolution authorized the officers, with the approval of the comptroller, to increase the capital stock in any multiple of $50,000 up to $300,000, as the subscriptions shall be paid in, is estopped from questioning the regularity of the proceedings after the certificate of the comptroller to such an increase is obtained.

3. SAME—VOTING BY PROXY—POWER OF ATTORNEY—WAIVER OF IRREGULARITIES.

A stockholder who, by power of attorney, has authorized another to vote his stock at any and all stockholders' meetings "in the same manner as I should do were I there personally present," is estopped, by the vote of his proxy, as respects any irregularities in the proceedings or calls of the meeting, which he could have waived if personally present.

79 Fed. 558, reversed.

In Error to the Circuit Court of the United States for the Western Division of the District of Washington.

This case was tried upon an agreed statement of facts. It appears from this statement: That the Columbia National Bank of Tacoma, plaintiff in error, was duly organized September 2, 1891. That the articles of the association provide that the capital stock shall be $200,000, divided into shares of $100 each, and that the capital stock may be increased at any time by shareholders owning two-thirds of the stock, according to the provisions of the act of congress of May 1, 1886; and in case of the increase of the capital of the association each shareholder shall have the privilege to subscribe for such number of shares of the proposed increase of the capital stock as he may be entitled to according to the number of shares owned by him before the stock was increased. That immediately after its organization it engaged in a general banking business at the city of

Tacoma, and continued until October 24, 1895, when Charles Clary, a bank examiner, by direction of the comptroller of the currency of the United States, took possession of the books, records, and assets of said bank, and closed its doors, and thereafter, on October 30, 1895, Charles Clary was appointed by said comptroller temporary receiver of said bank, and acted as such receiver until May 15, 1896, when the defendant Philip Tillinghast was duly appointed by said comptroller receiver of said association, and thereupon duly qualified as such, and ever since has been, and is now, the duly appointed, acting, and qualified receiver of said bank. That at a regular meeting of the shareholders of said association held January 12, 1892, said shareholders passed, by a vote of shareholders owning two-thirds of its capital stock, the following resolution: "Resolved, that under the provision of the act of May 1, 1886, the capital stock of this association be increased in the sum of $300,000, making the total capital $500,000. Further resolved, that, as the money paid in amounts to $50,000 or more, the president or cashier be authorized to certify the same to the comptroller of the currency, and shall so continue to certify until the said $300,000 is paid in." That on July 13, 1892, L. P. Mathews, the defendant in error, purchased 12 shares of the original capital stock of the association, and paid therefor, and received a certificate therefor issued in due form. That on October 28, 1892, L. P. Mathews subscribed for 23 shares of the increased capital stock of the association, voted at the meeting of the shareholders on January 12, 1892, and paid to said association $2,300 therefor; whereupon the name of L. P. Mathews was entered upon the books of the bank as the holder of 23 shares of the increased capital stock of the bank, and a certificate was issued and delivered to him therefor. That on November 29, 1892, Mathews, at the request of the bank, forwarded to its officers a blank power of attorney to vote on his stock, as follows: "Know all men by these presents, that L. P. Mathews, of Crete, state of Nebraska, do hereby constitute and appoint ———, of Tacoma, state of Washington, my attorney, for me, and in my name, place, and stead, to vote at any and all stockholders' meetings of the Columbia National Bank of Tacoma, Washington, until this power is revoked, on all shares of stock of said National Bank of Tacoma, Washington, on which I shall have the right to vote, and in the same manner as I should do were I then personally present, with power to substitute an attorney under him for like purposes." The blank was afterwards filled in by the officers of the bank having authority so to do by inserting the name of T. W. Bean. This proxy was never formally revoked. Mathews had no knowledge of the name that had been inserted in said instrument. That on December 28, 1893, at a meeting of the board of directors of the association duly called, on motion, a 4 per cent. dividend was declared payable on and after January 2, 1894. That on January 2, 1894, the officers of the bank inclosed in an envelope addressed to Mathews, without any letter or word of explanation, two instruments: (1) An ordinary dividend check, drawn upon the Columbia National Bank of Tacoma, showing upon its face that it was a 4 per cent. dividend declared upon the capital stock of the bank, for $48; and (2) an ordinary draft for $92, drawn upon the Continental National Bank of Chicago, there being nothing upon its face to indicate for what it was paid. Both of these instruments were received by Mathews in due course of mail, and he collected the money upon the same. That on July 25, 1895, at a meeting of the board of directors of the association, the following resolution was adopted: "Whereas, on the 12th day of January, 1892, this association resolved to increase its capital stock in the sum of $300,000, making a total capital, as increased, of $500,000; and also resolved, that, as payments aggregating $50,000 or more were made, the same should be certified to the comptroller of the currency; and whereas $150,000 of such increase of capital has been paid in, and certificates issued therefor, the remaining $150,000 of such proposed increased capital stock not having been paid in, resolved, that the unpaid portion of such proposed increase of said capital stock be canceled and rescinded, and that the paid-up capital stock of said association be, and the same is hereby, fixed at $350,000, and that the comptroller of the currency be notified of the increase of $150,000 in said capital stock,—making a total capital of $350,000,—and that the same has been paid in, and that he be requested to approve and issue a certificate of such increase according to law." A copy of this resolution was duly transmitted to the comptroller of the currency, together with a certificate of said bank in words

and figures following, to wit: "Columbia National Bank of Tacoma, July 25, 1895. To the Comptroller of the Currency, Washington, D. C.: It is hereby certified that the capital stock of the Columbia National Bank of Tacoma, Washington, has been increased, pursuant to the act of congress approved May 1, 1886, in the sum of $150,000, all of which has been paid in cash, and that the paid-up capital stock of said bank now amounts to $350,000,"—to which certificate was annexed the affidavit of the cashier that the certificate subscribed by him is true. That Mathews was not a director of the association. No notice of the above-mentioned meeting of the board of directors, or of its action at said meeting, or of the forwarding of said certificate to the comptroller of the currency, was given to him, and he had no actual knowledge thereof until long after the bank closed. That on August 9, 1895, the comptroller of the currency sent a letter, directed to the cashier of the Columbia National Bank, to the effect that he had determined to approve an increase in the sum of $150,000 upon the following conditions: "A meeting of the shareholders must be called for the purpose of considering the question of increasing the capital stock, and the notice of said meeting must be given to the shareholders, by mail or publication, thirty days prior to the date of holding the same, and must specifically state that the matter of increasing the capital stock in the sum of $150,000, making the capital after increase $350,000, will be considered at such meeting, and such other business as may properly come before it. If at such meeting a two-thirds stock vote is obtained in favor of said increase, and the legal requirements are fully met, the increase will receive my approval." That subdivision 8 of the articles of the association provides as follows: "These articles of association may be changed or amended at any time by shareholders owning a majority of the stock of the association, in any manner not inconsistent with the law; and the board of directors or any three shareholders may call a meeting of shareholders for this or any other purpose not inconsistent with law, by publishing notice thereof for thirty days in a newspaper published in the town, city, or county where the bank is located, or by mailing to each shareholder notice in writing thirty days before the time fixed for the meeting." That on August 9, 1895, and continuously thereafter until September 9, 1895, the following notice was inserted in a daily newspaper published at Tacoma, to wit: "Stockholders' Meeting. A special meeting of the stockholders of the Columbia National Bank of Tacoma, Washington, is hereby called for Monday, the 9th day of September, 1895, at 10 o'clock a. m., at the office of said bank, to take action in regard to the increase of the capital stock in the sum of $150,000, making the capital, after increase, $350,000, will be considered at such meeting, and to attend to any other business that may properly come before the meeting,"—signed by the proper officers. No notice of this proposed meeting was mailed to Mathews, and he had no actual knowledge of the meeting, or that it had been held, until after October 24, 1895. That on September 9, 1895, a meeting of the stockholders of the bank was held at the office of the bank, at which 9 shareholders were present in person, and said T. W. Bean, acting under similar powers of attorney, was present claiming to represent 58 other stockholders. The total number of shares so represented at said meeting was 1,578, and of the votes of said stockholders the full amount of shares so represented was cast in favor of the following resolution: "Resolved, that under the provisions of the act of May 1, 1886, the capital stock of this association be increased in the sum of $150,000, making a total capital, after increase, of $350,000; and it is further resolved, that the cashier be authorized to certify the same to the comptroller of the currency of the United States, according to law." T. W. Bean was present at this meeting, and voted 1,472 shares of stock in the name of various stockholders, including 12 shares belonging to Mathews. That on September 9, 1895, a certificate was forwarded by the officers of the bank to the comptroller of the currency of the holding of said meeting, and of the vote by which said resolution was passed. On the same day a further certificate was forwarded to the comptroller of the currency by the officers of the bank, to the effect that the capital stock of the bank had been increased, pursuant to the act of congress, in the sum of $150,000, all of which has been paid in cash, and that the paid-up capital stock of said bank now amounts to $350,000. That on September 9, 1895, the board of directors and officers of the bank requested one Charles P. Corbit, a stockholder and member of its board of directors, to go to Washing-

ton, D. C., personally, and present the application of the bank for the purpose of obtaining the certificate of the comptroller of the currency approving the increase of its capital. Corbit arrived at Washington September 14, 1895, and, after several personal interviews between Corbit and the comptroller, the comptroller of the currency, on October 23, 1895, signed a certificate as follows: "Whereas satisfactory notice has been transmitted to the comptroller of the currency that the capital stock of the Columbia National Bank of Tacoma, Washington, has been increased in the sum of $150,000, in accordance with the provision of the act of congress approved May 1, 1886, and that the whole amount of such increase has been paid in, and that the paid-up capital stock of said bank now amounts to the sum of $350,000: Now, it is hereby certified that the capital stock of the Columbia National Bank * * * has been increased as aforesaid in the sum of $150,000, that said increase of capital has been paid into said bank as a part of the capital stock thereof, and that said increase of capital is approved by the comptroller of the currency." This certificate was not delivered to Corbit, but, after it was executed, was duly mailed by the comptroller to the Columbia National Bank of Tacoma, Wash.; but when it reached Tacoma the said bank was in the hands of a bank examiner, and as a matter of fact it never came into the possession of any of the officers of the bank. That at all times subsequent to January 12, 1892, until the bank closed, the proposed increase of capital of the bank was mentioned and described in all of its published statements and reports, and in its reports to the comptroller of the currency, as capital stock paid in uncertified, and was so entered and carried upon the books of the bank. That subsequent to September 9, 1895, the bank continued in business until it closed, and incurred debts during this time in a large amount. That on June 22, 1896, the comptroller of the currency of the United States, having ascertained and determined that the assets and property and credits of the said association were insufficient to pay its debts and liabilities, made an assessment and requisition upon the shareholders of the said Columbia National Bank of Tacoma of $61 upon each and every share of the capital stock held and owned by them respectively at the time of its default, and selected the defendant Philip Tillinghast as receiver thereof, to take all necessary proceedings, by suit or otherwise, to enforce to that extent the individual liability of said shareholders. On June 28, 1896, Philip Tillinghast, as receiver, duly demanded of Mathews the aforesaid assessment and requisition upon 35 shares of stock, whereupon Mathews paid to Philip Tillinghast, as such receiver, the sum of $732, and no more, and refused, and still refuses, to pay the balance of $1,403, or any part thereof.

Section 5142 of the Revised Statutes provides that: "Any association formed under this title may, by its articles of association provide for an increase of its capital from time to time, as may be deemed expedient, subject to the limitations of this title. But the maximum of such increase to be provided in the articles of association shall be determined by the comptroller of the currency; and no increase of capital shall be valid until the whole amount of such increase is paid in, and notice thereof has been transmitted to the comptroller of the currency, and his certificate obtained specifying the amount of such increase of capital stock, with his approval thereof, and that it has been duly paid in as part of the capital of such association." On May 1, 1886, congress passed an act to enable national banking associations to increase their capital stock, which reads as follows: "That any national banking association may, with the approval of the comptroller of the currency, by the vote of shareholders owning two-thirds of the stock of such association, increase its capital stock in accordance with existing laws, to any sum approved by the said comptroller notwithstanding the limit fixed in its original articles of association and determined by said comptroller; and no increase of the capital stock of any national banking association either within or beyond the limit fixed in its original articles of association shall be made except in the manner herein provided." 24 Stat. 18.

Tillinghast & Pritchard, for plaintiffs in error.

T. H. Hammond, for defendant in error.

Before ROSS and MORROW, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after stating the facts). This action was brought by L. P. Mathews, the defendant in error, against the National Bank of Tacoma and Philip Tillinghast, its receiver, the plaintiffs in error, to establish his claim against them for the sum of $2,525, being the amount paid by him on his subscription for the increased shares of stock, with interest. A demurrer to the complaint was overruled (77 Fed. 372), and upon issue joined the cause was tried before the court without a jury, and judgment rendered in favor of the defendant in error (79 Fed. 558). The right of Mathews to recover herein was sustained by the circuit court upon the ground that the vote of the stockholders of the bank to increase its capital stock to the amount of $500,000 never became effective because the full amount thereof was not subscribed or paid for; that the board of directors was not authorized to cancel that portion of the increased stock which was in excess of the amount which was subscribed and paid for; that the board had no authority to give the assent of the corporation to any increase, because that power belonged exclusively to the shareholders; and that a subscriber for the increased stock had, therefore, the right to recover back from the bank the amount paid upon his subscription. Is this conclusion correct? This question is important. It has been answered by opposing opinions in different circuits, and for that reason, as well as others, has received careful thought and study. That the association had the power, after authorizing an increase of the capital stock of $300,000 so as to make a capital in the full sum of $500,000, as voted at the meeting held on January 12, 1892, to thereafter assent to a reduction of the increase of $150,000, making the capital of the bank $350,000, which amount had been paid in, is undoubted. This question is, we think, settled by the decision of the court in Delano v. Butler, 118 U. S. 634, 649, 7 Sup. Ct. 39. It is true that in that case reference was made only to the provisions of section 5142 of the Revised Statutes, and all the requirements of that statute were fully complied with, and all steps were taken in accordance with the articles of the association, while in this case it is earnestly contended that some of the proceedings were irregular. But that difference in the facts does not affect the question as to the power of making the change in the increase of the capital stock by reducing the amount so as to conform to the amount actually paid in. In that case the court said:

"The circumstance that the original proposal was for an increase of $500,000, subsequently reduced to the amount actually paid in, does not seem to affect the question, for the amount of the increase within the maximum was always subject to the discretionary power of the association itself, exerted in accordance with its articles of association, and to the approval and confirmation of the comptroller of the currency."

In Aspinwall v. Butler, 133 U. S. 595, 609, 10 Sup. Ct. 422, the court, after quoting from the Delano Case, said:

"In these remarks we entirely concur, and do not see why they do not furnish a complete answer to the objection arising from the change of amount. There was no agreement or condition that the amount should not be changed. The making of the change, therefore, could not have the effect of enabling the defendant to repudiate his subscription and his acceptance of the stock, unless he could show that the change was fraudulently made, or was made to such an inequitable extent as to defeat the purpose and object of the increase. If these views

are correct, it makes no manner of difference what the defendant afterwards did in the way of objection or protest, either at the stockholders' meeting or elsewhere."

See, also, Bank v. Eaton, 141 U. S. 227, 11 Sup. Ct. 984.

We do not deem it necessary to discuss seriatim the objections urged by the defendant in error to the various alleged irregularities in the proceedings of the association or of the action of the comptroller of the currency. There are two controlling principles relied upon by the plaintiffs in error, which, if sustained, are absolutely conclusive upon all the various questions that have been elaborately argued by the respective counsel in favor of or against the conclusions reached by the circuit court. The first proposition raises the question whether or not the certificate of the comptroller of the currency, on October 23, 1895, that the capital stock of the bank had been increased by $150,000, and that this amount had been paid in cash, is a conclusive determination of the regularity of all the acts of the officers, its stockholders, and of the corporation itself, and cannot be attacked in this action. Under the provisions of the statute it is made the duty of the comptroller of the currency to specify in his certificate the amount of the increase of the capital stock, with his approval thereof, and that the amount has been paid in cash. The statute virtually imposes upon him the judicial power of determining upon the regularity of all the preliminary proceedings leading up to the increase of the capital stock of the banking corporation. It has frequently been held that the determination of the comptroller of the currency as to the existence of the facts and conditions necessary to authorize the original formation of a banking association becomes conclusive by the issuance of his certificate approving the formation of the bank and authorizing it to proceed to business; that the action of the comptroller in deciding that the facts presented to him authorized the appointment of a receiver for a national banking association is conclusive in all proceedings which may thereafter be instituted; and that the action of the comptroller in declaring to what extent the individual liability of the stockholders shall be enforced in all cases where a national banking association is insolvent is conclusive. Kennedy v. Gibson, 8 Wall. 498, 505; Casey v. Galli, 94 U. S. 673, 679; Bank v. Case, 99 U. S. 628; U. S. v. Knox, 102 U. S. 422, 425; Bushnell v. Leland. 164 U. S. 684, 17 Sup. Ct. 209; McCormick v. Bank, 165 U. S. 538, 548, 17 Sup. Ct. 433.

In Kennedy v. Gibson, the court, in discussing the appointment of a receiver and of the institution of the proceedings against the stockholders to enforce their individual liability, said:

"The receiver is the instrument of the comptroller. He is appointed by the comptroller, and the power of appointment carries with it the power of removal. It is for the comptroller to decide when it is necessary to institute proceedings against the stockholders to enforce their personal liability, and whether the whole or a part, and, if only a part, how much, shall be collected. These questions are referred to his judgment and discretion, and his determination is conclusive. The stockholders cannot controvert it. It is not to be questioned in the litigation that may ensue. He may make it at such time as he may deem proper, and upon such data as shall be satisfactory to him."

In Casey v. Galli the questions arose upon demurrer. The court said:

"The plea proposes to go behind the certificate, and contradict it. This cannot be done. The comptroller was clothed with jurisdiction to decide as to the completeness of the organization, and his certificate is conclusive upon the subject for all the purposes of this litigation."

In Bushnell v. Leland, the court, speaking of the various assignments of error there made, said:

"All these alleged errors may be reduced to the single contention that under the national banking law the comptroller of the currency is without power to appoint a receiver to a defaulting or insolvent national bank, or to call for a ratable assessment upon the stockholders of such bank, without a previous judicial ascertainment of the necessity for the appointment of the receiver and of the existence of the liabilities of the bank; and that the lodgment of authority in the comptroller, empowering him either to appoint a receiver or to make a ratable call upon the stockholders, is tantamount to vesting that officer with judicial power in violation of the constitution. All of these contentions have been long since settled, and are not open to further discussion."

We are unable to perceive any distinction between those cases and the one under consideration. The statutes conferring the power upon and prescribing the duties of the comptroller in each case are substantially the same. There is no valid reason that can be urged against the conclusiveness of the comptroller's certificate in this case that could not be urged with equal force and strength in the other cases. By the several provisions of the statute, in the various steps to be taken by the bank, the comptroller is called upon to act, and is invested with clearly-defined powers and authority, judicial in their character, to decide as to when and how he shall act, and to determine the facts upon which the lawful exercise of his authority depends; and his decision upon those facts ought not, and cannot, in the very nature of the power and authority confided to him by the statute, be questioned in any collateral proceedings in the courts. His judgment as to the sufficiency of the facts and regularity of the proceedings, like that of other special tribunals, upon matters coming within his exclusive jurisdiction, is unassailable except by a direct proceeding for correction or amendment. The identical question under discussion was presented in Latimer v. Bard, 76 Fed. 536, 540, which was an action brought by the receiver against a stockholder to recover the amount of an assessment made by the comptroller of the currency. The answer to the complaint set up the defense that the assessment was levied upon a pretended increase of stock, and that such increase was invalid and unlawful for the reason that the whole amount of such increase was not paid in, and the particular acts of irregularity and of alleged false and fictitious entries of the books of the bank were set out in detail. To this complaint the receiver interposed a demurrer. The comptroller in that case, as in this, had certified that the amount of subscription for the increase of stock had been paid in. Judge Adams, in the course of his opinion, said:

"It seems to me clear that the action of the comptroller of the currency in certifying that the whole amount of the increase of stock had been paid in, with his approval of the increase, so partakes of the judicial character that it cannot be assailed in this proceeding. In reaching this conclusion it must be borne in mind that the particular matter which, by the answer, is relied upon as a defense is by the act of congress pointedly referred to the comptroller for his finding and certification. If, therefore, the finding of any executive officer of the

government in any case is to be treated as conclusive (except as against direct attack), it seems to me his finding and certificate of this fact ought to be. The important and divers business interests of a bank, and the welfare of its stockholders and creditors, demand, in my opinion, that a matter of fact so affecting each and all of these features as the stockholders' relations to the bank and their liability to its creditors should be fixed clearly and definitely by some decisive authority; and this is what I think congress undertook to do in requiring the comptroller of the currency to find and certify to the fact in question, and, as a result thereof, to give his approval to the increase."

In Tillinghast v. Bailey, in the Southern district of Ohio, 86 Fed. 46, Judge Clark, in a case similar to this, arrived at the same conclusion.

The other principle relates to the question of estoppel. When a man subscribes to a proposed increased of stock in a national bank with knowledge that the stockholders had, by a resolution duly passed, authorized the officers of the association, with the approval of the comptroller of the currency, to increase the capital stock in any multiple of $50,000, up to $300,000, as the subscriptions shall be paid in, he is bound by his act of subscription in any amount of the increased stock which may at any time thereafter be voted and authorized, not exceeding the amount of $300,000, and not exceeding the amount of money actually paid in; and is estopped from questioning the regularity of the proceedings of the bank, its directors, officers, or shareholders, provided the certificate and consent of the comptroller of the currency to such increase has been obtained. Mathews having regularly subscribed for a certain number of the shares of increased stock in pursuance of the vote of the shareholders of the banking association at a regular meeting of said shareholders held on January 12, 1892, and having voted at said meeting as a shareholder, and paid to said association the sum of $2,300 for the shares by him subscribed for, and his name having been duly entered upon the books of the association as the holder of such shares of the increased stock, and having thereafter, in the due course of business, received the dividends duly declared thereon, it does not lie in his mouth to say, as against the creditors of the bank, that the meeting on July 25, 1895, when the increased stock of $150,000 was voted for, was not regularly called. He is estopped from saying that he had no notice of the meeting held in 1895, or of the action then taken, or of the certificate thereafter issued by the comptroller. He is, moreover, estopped from denying or repudiating the authority given by his general power of attorney to T. W. Bean to act and vote in his place and stead at all the stockholders' meetings of the association. He is estopped from saying that he did not authorize the name of T. W. Bean to be inserted in the blank left by him to be filled in by the bank with the name of any person its officers might select. It was his duty to ascertain that fact. It is enough to say that the power of attorney or proxy so given by him was never revoked. The power given was general in its character; not limited as to time or to any specific acts. His proxy was authorized "to vote at any and all stockholders' meetings * * * until this power is revoked, on all shares of stock * * * on which I shall have the right to vote. and in the same manner as I should do were I there personally present." Any vote which Bean thereafter cast was, to all

intents and purposes, the vote of Mathews. Any irregularity in the proceedings, or calls of the meeting, if there were any, which could have been waived by Mathews if personally present, could be waived by his proxy, and such waiver was binding upon him. Again, it is apparent from the facts of this case that, until the association failed, Mathews considered himself a subscriber to the increased shares of stock, as well as of the original shares, subscribed for by him. He accepted and pocketed the dividends without objection, and without any murmur or complaint. Had it continued prosperous, it is safe to say that none of the objections which he now seeks to urge against the regularity or validity of the increase would have ever come from him. He allowed the association, in its regular notices published, as required by law, to represent to its depositors, customers, and patrons that the stock had been increased. He is therefore estopped, after its failure, from denying that he was a subscriber. This principle cannot, upon any sound reason, be denied. When the law requires a public declaration or notice of the amount of the capital of a national or any other bank to be given to the world, or to the community where the bank operates, it contemplates a truthful and honest statement; one upon which the general public dealing with the bank may rely. The notice is not required for the sole purpose of imparting knowledge to the stockholders. It is made, and required to be made, for the benefit of the public, and especially for the information of all parties having dealings and transactions with the bank. If a contrary rule should prevail, it is plain to be seen that one of the securities which the creditors of a bank have would be taken away, and they would be left to the mercy of the shareholders, whose diligence and energy could always be relied upon, in case of danger to themselves, to find a variety of reasons tending to show that some of their actions or the decisions of the comptroller were not in all respects regular. It is true that there may be cases of individual hardship upon the stockholders of the bank, but when a man subscribes to the stock he has the power, and it is his right and duty, to keep himself advised of the transactions of the bank; and he can at any time, in the event of any departure from the established rules, take such steps as may be necessary to compel the directors and the stockholders to proceed in all their transactions in strict conformity with the law. If he fails to do so, it is but fair and just that he should be held liable.

The question as to the shortness of the time elapsing in this case between the date when the comptroller of the currency approved the increase of the capital stock and the date when he took possession of the books and assets of the bank is immaterial. It is the principle involved that controls the decision, not the length of time intervening between the acts. The door of construction cannot be opened in the courts as to what particular period of time must transpire before the principle should be applied. Mathews, having been a subscriber and stockholder, accepting its profits and sharing in its benefits, must be held legally bound to all the consequences of his relations to the bank. He must perform the obligation which he voluntarily assumed. Having received the advantages of a stockholder in the days of the bank's prosperity, he cannot be permitted to avoid its responsibility

to its creditors in the day of its adversity. The principles announced, and the reasons given therefor, in the following cases, more or less analogous to the case at bar, fully support the conclusions we have reached upon this point: Sawyer v. Hoag, 17 Wall. 610, 623; Upton v. Tribilcock, 91 U. S. 45; Sanger v. Upton, Id. 56, 64; Webster v. Upton, Id. 65, 69; Chubb v. Upton, 95 U. S. 665, 667; Pullman v. Upton, 96 U. S. 328; County of Morgan v. Allen, 103 U. S. 498, 508; Hawkins v. Glenn, 131 U. S. 319, 329, 335, 9 Sup. Ct. 739; Veeder v. Mudgett, 95 N. Y. 295, 310. The judgment of the circuit court is reversed.