SYNNOTT et al. v. CUMBERLAND BLDG. LOAN ASS'N.

(Circuit Court of Appeals, Sixth Circuit.   July 8, 1902.)

No. 1,045.

**1. BUILDING AND LOAN ASSOCIATIONS—RIGHTS OF SHAREHOLDERS—CHANGE IN CHARACTER OF STOCK.**

Complainants were holders of full-paid, or so-called "common," stock of a building and loan association. By the by-laws the holders of full-paid stock were given the sole right to vote and to control the business of the association, but their capital was made subject to reduction to make good any losses sustained by the association in favor of installment stockholders. At a meeting called for the purpose in which both classes of stockholders participated, the laws of the association were amended so as to place both classes of stock on an equality in the respects stated; nearly all of the common stock, including that owned by complainants, who were represented by proxy, being voted in favor of the proposition. *Held* that, in the absence of any evidence of fraud or claim that the meeting was irregular or the proxy exceeded his authority, such action was valid and binding on complainants, and that they could not recover of the association as creditors the price paid for their stock either on the ground that its issuance with the privileges originally accorded to it over installment stock was ultra vires, or that the action taken was a repudiation by the corporation of the contract by which they became stockholders.

**2. CORPORATIONS—SPECIAL STOCKHOLDERS' MEETINGS—TRANSACTION OF BUSINESS NOT STATED IN NOTICE.**

The requirement that the business transacted at a special meeting of stockholders shall be limited to that stated in the notice of such meeting is one for the benefit of the stockholders, which they may waive, and which is waived by their attendance and participation in the business done without objection.

**3. SAME—RIGHT TO REPUDIATE ACTION OF PROXY—LACHES.**

A stockholder is bound by the action of his proxy at a stockholders' meeting, unless he exercises the most active diligence in repudiating the same, and is chargeable with such knowledge of what was done at the meeting as he ought to have obtained and would have obtained in the exercise of reasonable diligence and care with respect to his business and property rights; a delay of more than a year before taking any steps to repudiate the action of his proxy, if unexcused, is such laches as will debar a stockholder from the right to relief.

**4. BUILDING AND LOAN ASSOCIATIONS—RIGHTS OF SHAREHOLDERS—CHANGE IN CHARACTER OF STOCK.**

The holders of full-paid stock in a building and loan association, who were given full control of its business by the by-laws, but were required to make good any impairment of capital in favor of installment stockholders, at a stockholders' meeting charged up against their stock the amount of losses which had been sustained by the association. Subsequently they consented to, and were instrumental in bringing about, a change in the by-laws by which full-paid and installment stock were placed on an equality. *Held* that, in the absence of misrepresentation or deceit inducing their action, they were not entitled to have the losses previously charged to them repaid.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

The complainants are severally holders of shares in the capital stock of the defendant corporation of the class called "common stock." The object

¶ 2. See Corporations, vol. 12, Cent. Dig. § 742.

of the bill is to recover the price paid for their shares upon the theory that the issuance of said "common stock," with the rights and privileges accorded it over the general shares, called "installment stock," was ultra vires the corporation. The defendant is, as its name implies, a building and loan incorporation, and was organized in 1892 under the general laws of Tennessee authorizing such corporations. Section 14, c. 142, Acts Tenn. 1875 (Shannon's Code Tenn. §§ 2128–2142). In April, 1893, its charter was amended so as to acquire the additional powers conferred by chapter 12 of the Tennessee Acts for 1893. The by-laws fixed the authorized capital stock at $10,000,000, of which not more than $100,000 should be "common stock." To the shares misleadingly called "common stock" was accorded the entire control and management of the corporation, the general or "installment stock" possessing no vote or voice in shareholders' meetings until fully paid up. Aside from the provisions for an unusual and undue participation of the "common stock" in the profits of the association, to be more fully shown later, and this very unusual disfranchisement, the "installment stock" was substantially like the ordinary shares in the modern building and loan association. To compensate for the disadvantages mentioned the by-laws provided that the fund derived from the sale of the common stock should constitute "an indemnity fund to be permanently held and invested for the protection of investors and installment stockholders." To accomplish this the common stockholders surrendered all right of "withdrawal," and consented that the capital contributed by them should remain until a final winding up, subject to reduction only for the purpose of making good "any losses of the association." The complainants aver and show that, after the corporation had organized and adopted the constitution and by-laws under which the common stock was authorized, they severally, upon solicitation, and because of the peculiar advantages, rights, and privileges accorded such shares, became subscribers for the shares now severally held by them. The total number of shares of common stock issued and paid for was 337, of the par value of $100 each. The entire affairs of the company from its organization in 1892 until July, 1898, was exclusively in the hands of this small body of common stockholders. While thus in control a loss of 45 per cent. of this total of common stock was charged up against the common stockholders to make good an impairment of capital to the extent of $15,000. This loss was assumed and charged against the common stock at a meeting of the stockholders of such common stock held on December 14, 1897, at which each one of the complainants was present in person or by proxy, and to which action each said stockholder assented. On January 17, 1898, at a meeting of all the shareholders, common and installment, the distinction between common and installment shares was abolished by amending the by-laws so as to strike out every privilege, right, or advantage which that stock had over the installment stock. The burden of standing as an indemnity against company losses was also removed, and the two kinds of stock put on a common plane in respect of burdens and benefits and in the right of voting. Complainants aver that the issuance of said common stock was in excess of the power of the corporation, and that they therefore stand as creditors to the extent of their several payments on account of their subscriptions to said stock. They further insist that the corporation itself has, by the action taken on January 17, 1898, repudiated said stock by abolishing the distinctions between such shares and the installment shares. They pray for a decree restoring to them the price paid, and tender their several certificates for cancellation. In the alternative they ask, if their shares were validly issued, that the common shareholders be restored to the control of the corporation, and that the installment shareholders be restrained from voting and held to their places in the rear. Upon the pleadings and proof the court below dismissed the bill, and from this decree an appeal has been perfected.

W. B. Russell, for appellant.
A. W. Chambliss, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

1. It must be conceded that whether the special privileges accorded the "common stock" over the "installment stock" were valid or invalid it was entirely competent for the common stockholders to agree with the company and the installment shareholders that their "common" shares should stand upon the same footing as shares of the "installment" shareholders, and that all distinction between the two kinds of stock should be eliminated. This is precisely what the corporate minute of the stockholders' meeting of January 17, 1898, shows was done. ·That minute includes the following recital:

"State Examiner Craig then called attention to the feature in the present plan of the association providing for the creation of common stock and endowing it with powers not granted to other classes of stock, and stated that the state department regarded this feature as calculated to destroy the mutuality of the association, and that the state department required that such mutuality be restored. After full discussion, and the common stockholders, by Mr. Hayward, having expressed a desire to be rid of the burdens they had assumed for which they would be willing to give up their special privileges and rights, Mr. Bemis moved and Mr. Chapin seconded the adoption of the following resolution."

The minute following shows the adoption of a series of resolutions amending the constitution and by-laws, operating to place the common and installment stock upon the same footing in respect to profits, burdens, and control. This action was taken upon a stock vote of 7,315 shares in the affirmative to 14 shares in the negative.

The evidence in respect to the occurrences of that meeting support this minute, and shows that the installment shareholders were somewhat reluctant to yield to what they had every reason to suppose was the express wish and desire of the common stockholders, and that in surrendering their claim to be indemnified against losses by the common stockholders they gave a full equivalent for equality in control and in distribution of profits. The evidence furthermore shows that Hayward, who then undertook to voice the wishes of the common stockholders, was the then owner of a full sixth of the whole issue, and that he held the proxies of the great mass of common stockholders, including Mrs. Synnott and her co-complainants.

How do the complainants propose to escape the results of the actions of the stockholders' meeting of January 17, 1898? Although the inspector for the state advised that the powers granted the common stock operated to destroy the mutuality of the association, it does not appear that there was any purpose upon the part of the association to repudiate the common shares or ignore the contract rights of such stockholders. The objection of the state inspector was undoubtedly pointed to that feature by which the small class of common stockholders were given exclusive control of the affairs of the corporation. The prepaid character of the stock and the provisions for dividends to be paid out of earnings were features expressly authorized by the amended charter under the act of April 5, 1893, and therefore not inconsistent with the mutual character of the association. The agreement by the common stockholders to stand as indemnitors of the other class of

stock against losses was an agreement in the general nature of a prefer-
ence to the installment shareholders, and had proven a very serious bur-
den to the common stockholders, and was probably unobjectionable.
Hamlin v. Railroad Co., 24 C. C. A. 271, 78 Fed. 664, 36 L. R. A. 826;
Cook, Corp. (4th Ed.) §§ 268, 269.   It was this burden, operating as a
preference in favor of the installment shares, which the common stock
was desirous of escaping, and that they might do so their representative
stated to the assembled stockholders of both kinds that to be rid of
this burden "they would be willing to give up their special privileges
and rights."   Upon the face of the minute of the meeting of January
17, 1898, and upon the evidence as to the occurrence at that meeting,
there was no repudiation by the corporation of the common stock as
ultra vires, but an agreement between the two classes of stockholders
and the company by which the common stockholders were relieved
from the burden they had assumed in conceding a preference out of
profits to installment stockholders as far as necessary to make good
any impairment of capital by losses, in consideration of their surrender
of the power of control and any other special advantages over other
prepaid stock in respect of dividends.   The bill does not challenge the
regularity of the meeting at which this action was taken, nor that com-
plainants were present or represented, or aver that their agent and at-
torney in fact exceeded his authority.   After alleging that the com-
plainants had subscribed for their stock in the full belief that the pro-
visions of the contract in respect thereto would be carried out and that
the agreement was valid, it is charged that the installment stock pres-
ent or represented at the meeting of January 17, 1898, greatly outnum-
bered in voting power the common stock present, and that the action
taken was "solely in the interest of such installment stockholders and
against the interests of the complainants and other holders of the com-
mon stock."   It is then alleged that the "reason assigned" for such
action was that the state treasurer, as the statutory inspector of such
associations, had declared that the provisions in regard to the common
stock were illegal and destructive of the mutuality of the association
was not the real reason, but that the real reason for the action taken
was:

"That the then acting managers of the association and those connected
with them might, by depriving the common stockholders of their right to
control the elections of directors of the association, remain in control of
affairs of the association without the consent of a majority of the holders
of the shares of the so-called 'common stock,' and that they, in combination
with certain holders of installment stock, adopted this latter plan for the
purpose of taking unto themselves the control of the association, notwith-
standing that the holder of each share of the installment stock in the as-
sociation had expressly waived the statutory right to vote thereon until
said stock should mature, and that the object and purpose of this combina-
tion and conspiracy was to deprive the holders of the common stock of the
benefits and privileges conferred by the constitution and by-laws of the de-
fendant corporation, which benefits and privileges were the real reason and
inducement to complainants and to all other subscribers for the said common
stock of defendant corporation to induce them to subscribe and pay for said
common stock, and but for such provisions in the constitution and by-laws
of said association your complainants would not have subscribed and paid
for said common stock or any part thereof."

The bill further avers:

"That in view of the acts and conduct of the defendant corporation, its officers, managers, and installment stockholders, as aforesaid, and upon the advice of counsel, your complainants further aver and charge that the issue of said common stock by defendant corporation was ultra vires of the corporation, and rested for support solely upon the contract between the parties and the doctrines of waiver; that, by reason of the aforesaid acts and conduct of the defendant corporation's officers, managers, and installment stockholders, said association has elected to abrogate the contract between complainants and all other holders of said common stock and the defendant corporation, and to rescind and avoid the same, and that by such acts and conduct defendant corporation, its managers, officers, and installment stockholders, have estopped themselves from asserting the validity of the issue of said common stock, or relying upon the contract and the waivers contained therein, under which said stock was issued and accepted by your complainants and the other holders thereof."

We have omitted the averments in respect to the action of a former meeting in charging up to the common stockholders certain losses sustained by the corporation as having no direct bearing upon the prime question in the case. Upon the premises stated the bill prays: First, that the common stock be declared null and void, and that the association be required to account to complainants for the moneys paid for said stock, with interest, "less any dividends or interest they may have received," etc.

No deception in respect of fact is charged as having been practiced by the association or its officers to induce subscription to the stock. If the complainants were misled at all, it was in respect to the legality of the by-laws which undertook to give to these shares, not the ordinary advantage of preference stock whereby a preference is accorded over other stockholders in respect to dividends and corporate property, such as that held valid by this court in Hamlin v. Railroad Co., 24 C. C. A. 271, 78 Fed. 664, 36 L. R. A. 826, nor the right to issue prepaid stock as authorized by the Tennessee act of 1893 and sanctioned as not hostile to the usual scheme of such associations in Fairchild v. Preston, 140 N. Y. 549, 35 N. E. 979, 24 L. R. A. 57, but an exclusive power of control whereby the borrowing class of stockholders were debarred from any voice in the management of the affairs of a company whose prime purpose was to enable them to secure homes by easy payments.

But this belief in the validity of this very extraordinary privilege over the ordinary stock was a common misconception of law, shared in by all who organized the corporation and by all who became shareholders. As the validity of the stipulations peculiar to the common stock was purely a question of law, the complainants must be presumed to have known the law as well as any one else. Banigan v. Bard, 134 U. S. 291, 295, 10 Sup. Ct. 565, 33 L. Ed. 932; Eaglesfield v. Londonderry, 4 Ch. Div. 693.

The averments of the bill in respect to a conspiracy between the then officers of the company and the installment stockholders to deprive the common stockholders of their power of control in order that they might be retained in office by the newly enfranchised stockholders has no foundation in fact and is utterly overthrown by the evidence. The officers and agents thus accused were themselves common stock-

holders, placed in office solely by the common stockholders. The averment and the fact that the installment stock present and voting greatly preponderated over the common stock would be a fact of great significance if·the common stock had been outvoted and deprived of contract rights against their will. Strangely enough, the common stockholders present in person or by proxy voted with the installment stockholders for all that was done, so that there is no ground for complaining of any oppressive action of the majority acting in their own interest.

Although there is no allegation in the pleadings which questions the validity of the action taken in depriving the common stock of its power of control upon the ground that the notice of the business to be done did not include the action complained of or that complainants were not bound by the consent of their proxy to the action taken because he had exceeded his authority, the case has been mainly staked upon these very questions. The by-laws provided that no business should be transacted at called meetings of stockholders except such as was included in the notice of the meeting. The original notice was for a meeting to be held on January 10, 1898. The notice then sent and received was in these words:

"December 31, 1897.

"Notice is hereby given that there will be a special meeting of the stockholders of the Cumberland Building Loan Association held at its office in Chattanooga, Tennessee, on Monday, January 10, 1898, at 10 a. m., for the purpose of altering, amending, or repealing the constitution and by-laws as a majority of the stock shall determine. A majority being necessary to such action, it is important that you be present either in person or by proxy. The state treasurer has been invited to attend. J. D. Roberts, President.

"James Hayward, Secretary."

A quorum not attending, the meeting was adjourned to January 17, 1898, and notice of this was sent as follows:

"January 10, 1898.

"Notice is hereby given that the meeting of the stockholders of the Cumberland Building Loan Association called for January 10th has been adjourned to January 17th, at 10 a. m., because a quorum of stock was not present. The purpose of the meeting is to so amend the by-laws as to protect the contracts and assets of the association, so that the rights of the borrowing and persisting members shall not be endangered by paying out to withdrawing members more than is equitably due them. This course is imperative, is requested by the state treasurer, and meets the approval of the officers of the association. If you cannot be present in person, please fill out and return the enclosed proxy by return mail.

"Respectfully yours, James Hayward, Secretary."

Mrs. Synnott, the principal complainant and owner of 50 shares of the common stock, seems to have sent no proxy for the meeting of January 10th, but on receiving notice of the adjournment sent a proxy to Mr. Hayward, as follows:

"I do hereby constitute and appoint James Hayward my true and lawful attorney for me and in my place and stead to cast the votes I am entitled to cast at the adjourned special meeting (or any adjournment thereof) of the stockholders of the Cumberland Building Loan Association to be held at Chattanooga, Tennessee, Monday, January 17, 1898; hereby ratifying and confirming the acts of my said attorney hereunder.

"Dated ——— day of January, 1898. Mary D. Synnott.

"Witness: T. W. Synnott."

The contention now is that, although the notice of the business of the original meeting for January 10th was wide enough to cover any kind of amendment of the constitution and by-laws, the notice of the adjourned meeting was restricted to a particular matter, which did not include any such action as that complained of, and that the authority of her proxy did not authorize him to vote her stock upon any other matter than the particular matter mentioned in the notice sent her of the adjourned meeting.

"An adjourned meeting," says Mr. Cook, in the recent edition of his work upon Corporations, at section 601, "is but a continuation of the meeting which has been adjourned; and when that meeting was regularly called and convened, and duly adjourned, the shareholders may at the adjourned meeting consider and determine any corporate business that might lawfully have been transacted at the original meeting." The notice of the adjournment was not necessary, but, being sent with notice of the particular business to be then done, it has the effect of limiting that which might be lawfully done to the business thus noticed. But the notice of the business to be transacted at special meetings of the stockholders is a provision for the benefit of the stockholders, and may be waived and is waived by attendance and participation without objection. Cook, Corp. (4th Ed.) § 599; Trust Co. v. Condon, 14 C. C. A. 314, 67 Fed. 84; Stebbins v. Merritt, 64 Mass. 27; Richardson v. Railroad Co., 44 Vt. 613; Manufacturing Co. v. McAlpin (C. C.) 5 Fed. 737; Chamberlin v. Railroad Co., 15 Ohio St. 225.

There was no limitation of the powers conferred in Mrs. Synnott's proxy. Her proxy attended the meeting, and in behalf of Mrs. Synnott, and himself and others represented by him, induced the very action of which she now complains by expressing the wish of the common stockholders to surrender their advantages in consideration of being relieved of their obligation to the ordinary shareholders. It has been held by the court of appeals for the Ninth circuit that any irregularity in the proceedings or call for a meeting which could have been waived by the stockholder if personally present could be waived by his proxy, and that such action would be binding upon him. Bank v. Matthews, 29 C. C. A. 491, 85 Fed. 934. To the same effect is Cook, Corp. (4th Ed.) § 601.

We deem it unnecessary to express any opinion as to the conclusive effect upon Mrs. Synnott of the action of Hayward in participating in the doing of business not included in the notice for the adjourned meeting, because we are of the opinion that, whether her agent could waive the sufficiency of the notice of the business undertaken at that meeting or not, nothing but the most active diligence in repudiating what was there done in her name and by her apparent consent can avoid the consequences of her agent's action. That action was had on January 17, 1898. This bill was filed May 1, 1899. For more than a year no protest was made to the action of her agent, and, indeed, the bill filed contains no word of complaint that he had exceeded his authority or that the meeting had exceeded the notice or call made for it.

An effort has been made to excuse Mrs. Synnott for her inaction by the claim that she did not know of the action taken at the January

117 F.—25

meeting until shortly before her bill was filed. Mrs. Synnott does not testify at all. Her husband says he acted for her in looking after her stock. He states that he cannot say definitely when he got the information as to what had been done, but thinks it was several months afterwards. Mr. Synnott was an old and expert building and loan man, and though he lived in another state it is hardly credible to suppose that he long remained in ignorance of so important and public an action as that affecting this common stock.

District Judge Clark, in an opinion filed in the record, said, in respect to this plea of ignorance as an excuse for more than a year's delay in repudiating the action of the proxy representing the shares of complainants, that:

"Upon a careful examination of the record, I conclude, as a proposition of fact, that the several agreements, made in the form of what is called stockholders' meetings and by proxy, are shown by the weight of the evidence to have been made with the knowledge and consent of this complainant and other holders of common stock. In holding that the evidence preponderates in favor of the proposition that complainant and other stockholders have agreed that a certain loss should be charged against the common stock, and finally that the installment and common stock should be put upon an equal basis, I hold the complainant and other stockholders to the duty of ascertaining and knowing from time to time such facts as persons of reasonable caution and prudence should know in giving reasonable attention to their business and property rights. I really have not the slightest doubt that at each stage of the proceedings the complainant and other stockholders in fact understood perfectly well what was going on, and just what Mr. Hayward was doing on their behalf, and they are chargeable also with presumptive knowledge of these facts, as attention to their business would necessarily have brought such knowledge to them."

This accords with the view of this court as expressed in the opinion of Judge Severens, who, in speaking for the court in reference to the presumption of knowledge indulged in against a stockholder who complains of some corporate action affecting his stock, said:

"The evidence leaves the question whether the Gronewegs have not in fact known all along the character of their stock; but we do not determine how that was, for we are of opinion that with reasonable diligence they should have known it, and that it may be fairly imputed to them that they did know it." Bailey v. Tillinghast, 40 C. C. A. 93, 99 Fed. 801.

It will not do to say that no change occurred in the attitude of the company between that action and the filing of the bill. We may take notice that the shares in such companies are constantly changing hands, and new shares being issued at short periods, constituting new series of stock. It may well be presumed that the elimination of the special powers of this common stock by the apparent consent of the stockholders would be an important factor in all the future issues of new stock and sales of old. Mrs. Synnott should have actively repudiated what was apparently done for her. Until she did so every one had a right to suppose that she had agreed to permit her shares to stand upon a plane of equality with other prepaid shares of what is called installment stock, and to act upon that theory. Cook, Corp. (4th Ed.) § 268; Kent v. Mining Co., 78 N. Y. 159.

2. There is even less excuse for the delay of the other four appellants, all of whom are shown by the evidence to have been represented

at both stockholders' meetings by Mr. Hayward. They neither challenge his right to represent them in their bill, nor in their evidence do they prove any departure from his authority. The averments in reference to a conspiracy to destroy the exclusive power of the common stock, in respect to control, for the purpose of keeping in office the then officers and agents of the corporation, has no shadow of evidence upon which to stand. This failing, there is no averment of the bill challenging the presumptions of knowledge and notice of the meeting and of participation therein, which is indulged in the absence of such an averment and evidence supporting it. Cook, Corp. (4th Ed.) § 600.

3. The insistence that the loss charged up to the common stock December 14, 1897, should be expunged, comes too late. That action, whether right or wrong, was the voluntary action of the common stockholders, every one of whom assented to it. Neither is there any material evidence that this consent was induced by any misrepresentations or deceit. The secretary of the company did express the opinion that the loss thus assumed would be soon made good out of the accruing profits; but this was a mere opinion,—one for which there was some foundation,—for it appears that when this bill was filed the book value of the stock had advanced from 55 to 70 per cent. of par. Whether the loss so assumed was a real loss or an apparent loss, and whether it was a loss within the strict terms of the indemnity afforded by the agreement of the common stockholders, is now of no importance. It was the construction put on their agreement by themselves, and the loss was one which they agreed to assume rather than have the state inspector lay before the whole of the stockholders a report showing in his judgment an impairment to the extent of $15,000. That impairment had been made good, and the common stock charged off to the extent of 45 per cent. of each share, more than a month before the second stockholders' meeting of January 17, 1898. That meeting dealt with the stock as it then stood, and complainants and all others holding that stock then agreed to surrender their exclusive right of control on condition that they should stand no longer subject to make good impairments in the capital of the association. There is no ground upon which the agreement then made should be set aside or any part of the loss theretofore paid repaid.

The decree of the court below must be affirmed.