## ASPINWALL v. BUTLER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

No. 957. Submitted January 7, 1890. — Decided March 3, 1890.

This case differs in no material fact from *Delano* v. *Butler*, 118 U. S. 634, and is governed by it.

When the previous proceedings looking to an increase in the capital stock of a national bank have been regular and all that are requisite, and a stockholder subscribes to his proportionate part of the increase and pays his subscription, the law does not attach to the subscription a condition that it is to be void if the whole increase authorized be not subscribed; although there may be cases in which equity would interfere to protect him in case of a material deficiency.

The provision in Rev. Stat. § 5142, that no increase of capital in a national bank shall be valid until the whole amount of the increase shall be paid in, and the Comptroller of the Currency notified and his consent obtained, was intended to secure the actual cash payment of the subscriptions made, and to prevent watering of stock; but not to invalidate *bona fide* subscriptions actually made and paid.

The Comptroller of the Currency has power by law to assent to an increase in the capital stock of a national bank less than that originally voted by the directors, but equal to the amount actually subscribed and paid for by the shareholders under that vote.

THE case is stated in the opinion.

*Mr. Benjamin N. Johnson*, for plaintiff in error, cited: *Eaton* v. *Pacific Nat. Bank*, 144 Mass. 260; *Winters* v. *Armstrong*, 37 Fed. Rep. 508; *Chubb* v. *Upton*, 95 U. S. 665;

*Hamilton Plank Road Co.* v. *Rice,* 7 Barb. 157; *Nutter* v. *Lexington &c. Railroad Co.,* 6 Gray, 85; *Salem Milldam Co.* v. *Ropes,* 6 Pick. 23; *Central Turnpike* v. *Valentine,* 10 Pick. 142; *Scovill* v. *Thayer,* 105 U. S. 143; *Sutherland* v. *Olcott,* 95 N. Y. 93; *Railway Co.* v. *Allerton,* 18 Wall. 233; *Gray* v. *Christian Society,* 137 Mass. 329; *People's Ins. Co.* v. *Westcott,* 14 Gray, 440; *Zabriskie* v. *Cleveland Railway Co.,* 23 How. 381; *Atlantic Delaine Co.* v. *Mason,* 5 R. I. 463.

*Mr. A. A. Ranney,* for defendant in error, cited : *Cadle* v. *Baker,* 20 Wall. 650; *Davis* v. *Essex Baptist Society,* 44 Connecticut, 582; *Upton* v. *Tribilcock,* 91 U. S. 47; *Winters* v. *Armstrong,* 37 Fed. Rep. 508, and cases cited; *Brigham* v. *Mead,* 10 Allen, 245; *Buffalo &c. Railroad* v. *Dudley,* 14 N. Y. 336; *Seymour* v. *Sturgess,* 26 N. Y. 134; *Am. Tube Works* v. *Boston Machine Co.,* 139 Mass. 5; *Reed* v. *Boston Machine Co.,* 141 Mass. 454; *Wontner* v. *Shairp,* 4 C. B. 404; *Asphitel* v. *Sercombe,* 5 Exch. 147; *Johnson* v. *Goslett,* 3 C. B. (N. S.) 569; *Watts* v. *Salter,* 10 C. B. 477; *Garwood* v. *Ede,* 1 Exch. 264; *Scovill* v. *Thayer,* 105 U. S. 143; *Chubb* v. *Upton,* 95 U. S. 665; *Pullman* v. *Upton,* 96 U. S. 928; *Casey* v. *Galli,* 94 U. S. 673; *Keyser* v. *Hitz,* 2 Mackey, 473; *Kennedy* v. *Gibson,* 8 Wall. 498; *Curran* v. *Arkansas,* 15 How. 304; *Hawthorne* v. *Calef,* 2 Wall. 10; *Davis* v. *Weed,* 44 Connecticut, 569, Shipman, J.; *Railway Co.* v. *Allerton,* 18 Wall. 233; *Sawyer* v. *Hoag,* 17 Wall. 610; *Gray* v. *Portland Bank,* 3 Mass. 364; *Hart* v. *St. Charles Street Railway,* 30 La. Ann. 758; *Terry* v. *Eagle Lock Co.,* 47 Connecticut, 141; *Clarke* v. *Thomas,* 34 Ohio St. 46; *Nutter* v. *Lexington &c. Railroad,* 6 Gray, 85; *Reed* v. *Memphis Gayoso Gas Co.,* 9 Heiskell, 545; *Skowhegan & Athens Railroad* v. *Kinsman,* 77 Maine, 370.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case is governed by that of *Delano* v. *Butler,* 118 U. S. 634. The cases are not identical, it is true; but the principles established in that case require a similar decision in this. The substantial facts, up to a certain point, are the same; what took place afterwards cannot vary the result.

The Pacific National Bank of Boston failed, and passed into the hands of a receiver on the 22d day of May, 1882; and the Comptroller of the Currency on the 27th of November, 1882, ordered an assessment of 100 per cent on the capital stock for the purpose of enforcing the individual liability of the stockholders, to pay the liabilities of the institution, under section 5151 of the Revised Statutes. Fifty shares of the stock, amounting to $5000, stood in the name of Aspinwall individually, and 50 other shares in his name as trustee and guardian. This suit was brought against him by the receiver of the bank to recover $5000 as the holder of the individual stock. He denied that he was the holder of any such stock; and, for another plea, averred that it had been fraudulently and illegally issued, and was not binding against him as a holder thereof. A trial by jury was waived, and the cause was tried by the Circuit Court, which made a special finding of facts, and decided in favor of the plaintiff. The writ of error is to that decision.

After the finding of facts had been made, the defendant prayed the court to rule "upon the facts found in this case the plaintiff is not entitled to judgment;" but the court refused this prayer, and found that the defendant was the owner of fifty shares of stock on May 20 and May 22, 1882; and entered judgment for the plaintiff for the sum of $6550; to which refusal to rule, ruling and entry of judgment the defendant then excepted; and this is the only exception in the case. The question is, whether this general finding is supported by the special facts found, and is in accordance with the law.

Amongst other things, the findings set forth the 5th and 6th of the original articles of association of the bank. By the 5th article the capital stock is fixed at $250,000, but with the privilege of being increased, according to section 5142 of the Revised Statutes, to any sum not exceeding $1,000,000; and in case of increase, each stockholder was to have the privilege of subscribing his *pro rata* share. The 6th article specifies the powers and duties of the board of directors, amongst which was the power "to provide for an increase of the capital of the association, and to regulate the manner in which

such increase shall be made," and the power "to make all by-laws that it may be proper and convenient for them to make under said Revised Statutes for the general regulation of the business of the association and the management and administration of its affairs."

The findings also set forth the first and eleventh by-laws of the bank; the former of which fixed the regular annual meeting of the stockholders for the election of directors on the second Tuesday of January of each year; fourteen days' notice of which was to be given. The eleventh by-law was as follows, to wit:

"Sec. 11. Whenever an increase of stock shall be determined upon it shall be the duty of the board to notify all the stockholders of the same and cause a subscription to be opened for such increase, and each stockholder shall have the privilege of subscribing for such number of shares of new stock as he may be entitled to subscribe for in proportion to his existing stock in the bank. If any stockholder should fail to subscribe for the amount of stock to which he may be entitled within a reasonable time, which shall be stated in the notice, the directors may determine what disposition shall be made of the privilege of subscribing for the new stock."

The findings further state:

"On the 13th day of September, 1881, the capital stock of the bank was $500,000, divided into 5000 shares of the par value of $100 each, of which shares the defendant, Aspinwall, as trustee under the will of Augustus Aspinwall and guardian under the will of Thomas Aspinwall for the benefit of his son, William H. Aspinwall, a minor, held fifty, which stood in his name as guardian and trustee on the books of the bank, a certificate of said shares having been taken in the same way. . . .

"September 13, 1881, the directors of the bank passed the following vote:

"' Voted, that the capital of this bank be increased to one million dollars, and that stockholders of this date have the right to take the new stock at par in an amount equal to that now held by them.' "

A printed notice of this resolution was thereupon sent to all the stockholders of the bank; and at the bottom of this printed notice there was left a space and lines indicated for stockholders to write therein their subscriptions to the new stock to which they were entitled. Other than this there was no subscription paper opened. Some stockholders signified their assent on the notice in the place indicated at the bottom and sent it to the bank. Others did not, but went or sent to the bank and paid the money for the new stock to which they would be entitled in the proposed increase, taking receipts in the printed form prepared for that purpose.

The defendant received said notice, and thereupon went to the bank and informed A. I. Benyon, its president, that he had not sufficient funds in his hands as guardian and trustee with which to take as such the fifty shares in the proposed increase, and that he should, therefore, subscribe for and take the same himself individually. The president of the bank said that he could do so. The defendant afterwards returned to the bank the said notice received by him with the following subscription written at the bottom thereof signed by him:

" I will take the fifty new shares to which I am entitled and will pay for them as above. WILLIAM ASPINWALL."

Subsequently, on October 1st, 1881, the defendant went to the bank and paid the sum of five thousand dollars, receiving therefor a receipt, a copy of which is as follows:

" Pacific National Bank.

" $5000. Boston, *October* 1st, 1881.

" Received of William Aspinwall five thousand dollars on account of subscription to new stock.

" J. M. PETTENGILL, *Cashier.*"

The defendant was well acquainted with Mr. Benyon, seeing him almost daily, and he did some business with the bank.

At the time the defendant paid this money and took this receipt he asked Mr. Benyon, the president of the bank, if

there was any of the new stock that had not been taken, stating that if that were the case he, the defendant, would like to take some more of the new stock. The president of the bank replied that all the new stock had been taken, and that the defendant could not have any more than fifty shares already subscribed for and taken. Defendant desired his certificate, but was told that he could only have a receipt, as they were not in a position to issue certificates. The defendant believed this statement of the president of the bank, that all the new stock had been taken, to be true, but he was not told that all the money had been paid for the new stock.

Payments for new stock in the proposed increase of $500,000 were made to the amount of $330,100 on and prior to October 1, 1881, subsequent to which time additional payments were made until November 15, 1881. The total amount thus paid in for new stock was $461,300.

Certificates for the new stock were issued on and after October 1, 1881, as called for, nearly all being delivered. The following is a copy of the certificate delivered to, and received by, the defendant, November 5, 1881, to wit:

"Fifty shares.

"Pacific National Bank of Boston, Mass.

"This certifies that William Aspinwall, of Brookline, is proprietor of fifty shares in the capital stock of the Pacific National Bank of Boston, Mass.; transferable only on the books of said bank in person or by attorney on surrender of this certificate.

"Boston, October 1, 1881.          A. I. Benyon, *President*.
"J. M. Pettengill, *Cashier*."

The bank kept a book, called a stock ledger, in which it entered the names of the stockholders, their places of residence, and the number of shares held by each in a debit and credit account.

An entry of fifty shares to the credit of William Aspinwall appears to have been made in this stock ledger, of which the following is a copy:

" William Aspinwall, of Brookline.

" October 1st, 1881.   By fifty shares . . . . . . .   $ 5000."

At what time this certificate and entry were made does not appear except by the books.   The stock ledger shows that the amount of capital stock as credited to the respective parties named therein in a credit and debit form as aforesaid was, on November 18, 1881, $961,300, and so remained to May 22, 1882, the entry as to said defendant being the same at the latter date as made originally as aforesaid.

On the 18th of November, 1881, said bank became insolvent, suspended payment, and closed its doors; and Daniel Needham, an examiner of national banks, was placed by the Comptroller of the Currency in charge of said bank and all its funds, assets, records and books.   The bank remained under the exclusive charge and in the possession of said Needham, with its doors closed to business, until on or about March 18, 1882.

A committee of the directors went to Washington in December, 1881, and had an interview with the Comptroller of the Currency in relation to the affairs of the bank.   The fact that a vote had been passed in September previous to increase the capital to a million dollars, and that the full amount of that increase had not been subscribed for or paid in when the bank failed, in November, was talked over in that conversation.   It was discussed with the Comptroller as to what should be done in view of the facts and as to what should be regarded as the capital of the bank, and in pursuance of that interview the directors of the bank, on December 13, 1881, passed the following vote, viz. :

" Voted, That whereas it was voted by this board on the thirteenth day of September last that the capital of this bank be increased to one million dollars, and that stockholders of this date have the right to take the new stock at par in equal amount to that held by them; and whereas the stockholders were duly notified of said vote, and also that subscriptions to the new stock would be payable October 1; and whereas $461,300 of said new stock has been taken and paid in; and whereas $38,700 thereof has not been taken and paid in:

"*Voted,* That said $38,700 of said stock be, and is hereby, cancelled and deducted from said capital stock of $1,000,000, and that the paid-up capital stock of this association amounts to $961,300.

"*Voted,* That the Comptroller of the Currency be notified that the capital of this association has been increased in the sum of $461,300, and that the whole amount of said increase has been paid in as part of the capital of this association, and that he be requested to issue his certificate of said increase to this association according to law."

The following certificate was thereupon sent to the Comptroller of the Currency by the cashier and sworn to by him, to wit:

"Pacific National Bank of Boston.

"DECEMBER 13, 1881.

"To the Comptroller of the Currency, Washington, D.C.:

"It is hereby certified that the capital stock of 'The Pacific National Bank of Boston' has been increased, pursuant to the articles of association of said bank, in the sum of four hundred and sixty-one thousand three hundred dollars, all of which has been paid in, and that the paid-up capital stock of said bank now amounts to nine hundred sixty-one thousand three hundred dollars.

"[SEAL.]            J. M. PETTENGILL, *Cashier.*"

Upon the receipt by the Comptroller of a copy of the vote of December 13th and the certificate of the cashier of December 13th the Comptroller sent, December 16, 1881, to the directors of the bank the following certificate:

"TREASURY DEPARTMENT,

"OFFICE OF COMPTROLLER OF THE CURRENCY,

"WASHINGTON, *December* 16, 1881.

"Whereas satisfactory notice has been transmitted to the Comptroller of the Currency, that the capital stock of 'The Pacific National Bank of Boston, Mass.,' has been increased

in the sum of four hundred and sixty-one thousand three hundred dollars in accordance with the provisions of its articles of association, and that the whole amount of such increase has been paid in:

"Now it is hereby certified that the capital stock of 'The Pacific National Bank of Boston, Mass.,' aforesaid has been increased as aforesaid in the sum of four hundred and sixty-one thousand three hundred dollars; that said increase of capital has been paid into said bank as a part of the capital stock thereof, and that the said increase of capital is approved by the Comptroller of the Currency.

"In witness whereof I hereunto affix my official signature.

"[SEAL.]                JOHN J. KNOX, *Comptroller.*"

At a meeting of the directors of the bank, held on the 14th of December, 1881, resolutions were adopted and a copy sent to the Comptroller, whereby, after setting forth, by way of recital, several particulars with regard to the condition of the bank, going to show that it might resume business under certain conditions, it was, amongst other things, resolved as follows, to wit:

"*Resolved*, That in the opinion of the directors of said bank the interests of both creditors and stockholders require its early reorganization.

"*Resolved*, That the Comptroller of the Currency be requested to authorize the stockholders of the association to levy an assessment of 100 per cent upon the par value of the capital stock now paid in, viz., $961,300, upon condition that said Weeks shall return to this bank $350,000 additional checks, as agreed, before said assessment shall be made."

Other resolutions adopted at the same time set forth a certain scheme of reorganization, and it was finally resolved as follows, to wit:

"*Resolved*, That a copy of these resolutions be forwarded to the Comptroller of the Currency and his approval asked of the scheme of reorganization herein set forth, and that he grant the directors until January 15, 1882, to perfect said scheme of organization."

There was no vote of the stockholders of said association passed relating to increase or reduction of its capital stock, unless the vote of January 10, 1882, hereafter mentioned, was such. On the 16th day of December, 1881, the Comptroller of the Currency sent to the bank the following communication, namely:

" WASHINGTON, *Dec.* 16, 1881.

" The Pacific National Bank of Boston, Massachusetts:

" The entire capital stock of the Pacific National Bank of Boston, Massachusetts, amounting to nine hundred and sixty-one thousand three hundred (961,300) dollars, having been lost, notice is hereby given to said bank, under the provisions of section 5205 of the Revised Statutes of the United States, to pay the deficiency in its capital stock by an assessment of one hundred (100) per cent upon its shareholders *pro rata* for the amount of capital stock held by each, and that if such deficiency shall not be paid and said bank shall refuse to go into liquidation, as provided by law, for three months after this notice shall have been received by it, a receiver may be appointed to close up the business of the association according to the provisions of section 5234 of the Revised Statutes of the United States. •

" In testimony whereof I have hereto subscribed my name and caused my seal of office to be affixed to these presents, at the Treasury Department, in the city of Washington and District of Columbia, this sixteenth day of December, A.D. 1881.

" [SEAL.] JOHN JAY KNOX,
*"Comptroller of the Currency."*

It does not appear that any communication was made to the defendant by the bank with reference to said votes of the directors of December 13 and 14, or the certificates of the Comptroller of December 16, or with reference to any change in the proposed increase in the capital of the bank to one million dollars. The defendant never saw nor had communicated to him the books of the bank or their contents. He was in the bank almost daily and knew of the suspension on November 18, 1881. He does not remember or believe

that he had knowledge of the proposed change, or the change made in the proposed increase of the stock of $500,000, and of the certificate of the Comptroller of December 16, 1881, until informed of the facts during the stockholders' meeting of January 10, 1882, or possibly on that day just before the meeting was organized and after the stockholders were assembled for the same, when he learned them.

On the 10th of January, 1882, the annual meeting of the stockholders of the bank was held pursuant to call. At this meeting the examiner made a report of the condition of the bank, a board of directors was chosen, and, after a statement by the counsel of the bank of the facts relating to the increase of its capital stock, and as to how much had in fact been paid in under the vote to increase to one million dollars, and of the legal result thereof, and of the vote of December 13, and the certificates of the Comptroller of the Currency, dated December 16, and after a full discussion of the matter, the following vote was adopted by stock vote, 5494 shares in favor and 55 shares against:

"*Voted*, In accordance with the notice of the Comptroller of the Currency, dated December 16, 1881, there be, and hereby is, laid an assessment of one hundred per cent upon the shareholders of the Pacific National Bank of Boston, Mass., *pro rata* for the amount of capital stock of said bank held by each shareholder.

"*Voted*, That the board of directors notify each shareholder of said assessment and collect the same forthwith."

Notice of this vote was sent to the stockholders.

The defendant attended said meeting of the shareholders, acting as the holder of and representing only the fifty shares of original stock held by him as trustee and guardian, and as such voted in the negative on the question of the assessment, expressly stating on his ballot that he voted as the holder of fifty shares of old stock held by him as trustee and guardian. He did not vote or in any way act at said meeting as the holder of any new stock, and notified the directors of the bank that he did not consider himself a holder of any shares in the alleged increase of $461,300.

April 28, 1882, the defendant paid the assessment voted January 10, 1882, on the fifty shares of original stock held by him as guardian and trustee, using his own personal funds to make such payment, but did not pay any assessment on any new stock.

On March 18, 1882, by permission of the Comptroller of the Currency, on representations to the effect that the bank was then solvent, the directors took possession of the assets of the bank, opened its doors to business, and continued to do a general banking business, loaning money, receiving and paying deposits, and paying debts and expenses, until the 20th day of May, 1882, but made no losses or new loans during that period.

On or about April 21, 1882, notice was sent to all those who had not paid the assessment voted January 10th, and amongst others to the defendant, that unless such assessment should be paid by the 28th of April, 1882, their stock would be advertised for sale, and would be sold at auction according to law on the 31st of May, 1882.

On the 22d of May, 1882, the defendant delivered to the cashier of the bank the certificate for new stock which he had received, and a written demand for the repayment of the $5000 which he had paid thereon; and on the 30th of May he brought suit against the bank therefor, which is still pending.

On the 20th of May, 1882, the directors voted to go into liquidation, and the business of the bank was closed, and a receiver was appointed by the Comptroller of the Currency. It was found that the liabilities of the bank, exclusive of capital stock, were $2,500,000, and its assets worth about $500,000.

The court further found that the board of directors and the Comptroller of the Currency acted in good faith and without fraud in the premises.

It will be seen from the foregoing statement that all the material facts which existed in the case of Delano v. Butler, qua. supra, existed in the present case, except that Delano actually paid the assessment made on his new stock as well as that made on his original stock; whereas, in the present case, Aspinwall refused to pay said assessment, repudiated the new

stock, and has brought suit to recover the amount of his subscription paid therefor.

We do not think that this difference makes any difference in the liability. The new stock was created in a regular manner by the board of directors, who had authority for that purpose; it was subscribed and actually paid in by the stockholders; it was certified to the Comptroller of the Currency, and approved by him; and it was reported to the meeting of stockholders and approved by them, as their almost unanimous vote for an assessment shows.

The most forcible objection to the validity of the increased capital of $461,300, is, that it did not equal the amount first voted for by the directors, which was $500,000. But as reduced, it had the sanction of the directors, the approval of the Comptroller of the Currency, and the assent of the stockholders at their meeting on the 10th of January, 1882. The deficiency under $500,000 arose from the fact that some of the stockholders did not avail themselves of their right to subscribe. The 11th section of the by-laws of the bank has this express provision, that "if any stockholder should fail to subscribe for the amount of stock to which he may be entitled within a reasonable time, which shall be stated in the notice, the directors may determine what disposition shall be made of the privilege of subscribing for the new stock." This gave the directors full power over the deficiency of the subscriptions, and was in itself authority, if no other existed, to validate the action of the directors and the Comptroller in disregarding such deficiency, and equating the new stock to the subscriptions actually made and paid in. There was no express condition that the individual subscriptions should be void if the whole $500,000 was not subscribed; and, in our judgment, there was no implied condition in law to that effect. Each subscriber, by paying the amount of his subscription, thereby indicated that it was not made on any such condition. It is not like the case of creditors signing a composition deed to take a certain proportion of their claims in discharge of their debtor. The fixed amount of capital stock in business corporations often remains unfilled, both as to the number of shares

subscribed, and as to payment of instalments; and the unsubscribed stock is issued from time to time as the exigencies of the company may require. The fact that some of the stock remains unsubscribed is not sufficient ground for a particular stockholder to withdraw his capital. There may be cases in which equity would interfere to protect subscribers to stock where a large and material deficiency in the amount of capital contemplated has occurred. But such cases would stand on their own circumstances. It could hardly be contended that the present case, in which more than ninety-two per cent of the contemplated increase of capital was actually subscribed and paid in, would belong to that category. In *Minor* v. *Mechanics' Bank of Alexandria*, 1 Pet. 46, only $320,000 out of $500,000 of capital authorized by the charter was subscribed in good faith, but the court did not regard this deficiency in the subscriptions as at all affecting the status of the corporation, or the validity of its operations.

Some reliance is placed on the words of the act of Congress which authorizes an increase of capital within the maximum prescribed in the articles of association. They are found in section 5142 of the Revised Statutes, which declares that any banking association may, by its articles, provide for an increase of its capital from time to time, but adds, "no increase of capital shall be valid until the whole amount of such increase is paid in, and notice thereof has been transmitted to the Comptroller of the Currency, and his certificate obtained specifying the amount," etc. This clause would have been violated by an issue of $500,000 of new stock, when only $461,300 was paid in; but not by an issue of the exact amount that was paid in. The clause in question was intended to secure the actual payment of the stock subscribed, and so to prevent what is called watering of stock. In the present case the statute was strictly and honestly complied with.

The argument of the defendant asks too much. It would apply to the original capital of a company as well as to an increase of capital. And will it do to say, after a company has been organized and gone into business, and dealt with the public, that its stockholders may withdraw their capital and

be exempt from statutory liability to creditors, if they can show that the capital stock of the company was not all subscribed?

In the *Delano Case* the objection under consideration was discussed by Mr. Justice Matthews, speaking for the court, in the manner following. He there said: "In the present case the association did, in fact, finally assent to an increase of the capital stock, limited to $461,300; that amount was paid in as capital, and the Comptroller of the Currency, by his certificate, approved of the increase, and certified to its payment; so that there seems little room to question the validity of the proceedings resulting in such increase. All the requisites of the statute were complied with. The circumstance that the original proposal was for an increase of $500,-000, subsequently reduced to the amount actually paid in, does not seem to affect the question, for the amount of the increase within the maximum was always subject to the discretionary power of the association itself, exerted in accordance with its articles of association, and to the approval and confirmation of the Comptroller of the Currency." 118 U. S. 649. In these remarks we entirely concur, and do not see why they do not furnish a complete answer to the objection arising from the change of amount. There was no agreement or condition that the amount should not be changed. The making of the change, therefore, could not have the effect of enabling the defendant to repudiate his subscription and his acceptance of the stock, unless he could show that the change was fraudulently made, or was made to such an inequitable extent as to defeat the purpose and object of the increase.

If these views are correct, it makes no manner of difference what the defendant afterwards did in the way of objection or protest, either at the stockholders' meeting or elsewhere. The stock was lawfully created, the defendant subscribed for the shares in question and paid for them, and received his certificate; and nothing was afterwards done by the directors, the Comptroller of the Currency, or the stockholders in meeting assembled, which they had not a perfect right to do. The defendant became a stockholder; he held the shares in ques-

tion when the bank finally went into liquidation; and, of course, became liable under section 5151 of the Revised Statutes to pay an amount equal to the stock by him so held.

The judgment is

*Affirmed.*