## BAILEY et al. v. TILLINGHAST.

(Circuit Court of Appeals, Sixth Circuit. February 12, 1900.)

No. 614.

1. NATIONAL BANKS—SUIT BY RECEIVER AGAINST STOCKHOLDERS—JURISDICTION OF EQUITY.

The receiver of an insolvent national bank may maintain a suit in equity to enforce an assessment against stockholders, where such assessment is less than the full amount of their liability; and, where the question of law involved is common as to a number of the stockholders, and rests upon substantially the same facts, they may be joined as defendants.

2. EQUITY JURISDICTION—PREVENTING MULTIPLICITY OF SUITS—JOINDER OF DEFENDANTS.

To authorize a plaintiff to maintain a suit in equity against a number of persons, it is not essential that there should be a community of interest between them; but where a common question of law arising upon similar facts is involved between the plaintiff and each defendant, equity has jurisdiction on the ground of preventing a multiplicity of suits.

3. NATIONAL BANKS—LIABILITY OF STOCKHOLDERS—DEFENSES.

It is incompatible with the policy and purposes of the national banking laws to permit mere irregularities, or even fraudulent practices, in the organization or management of a bank created thereunder, to invalidate its action, and give ground for a stockholder to repudiate his obligations to the public.

4. SAME—INCREASE OF CAPITAL—CONCLUSIVENESS OF COMPTROLLER'S CERTIFICATE.

The comptroller's certificate, authorizing an increase of the capital stock of a national bank, is conclusive of the existence of all the facts necessary to authorize such increase in favor of the public and against the subscribers to such stock.

5. SAME—VALIDITY OF INCREASE.

By a resolution duly passed, the stockholders of a national bank authorized an increase of $300,000 in the capital stock, and under such resolution defendants and others subscribed and paid for such stock to the amount of $150,000, and received certificates therefor, upon which dividends were paid the same as on the original stock. The names of the subscribers were entered on the books of the bank as stockholders, but the increase was not certified to the comptroller until three years later, the stock being shown during that time in the published statements of the bank as "stock paid in, but not certified." At the end of that time a second resolution was passed, reducing the amount of the authorized increase to $150,000, and directing the same to be certified to the comptroller, which was done, and the increase was approved by him. The bank was then known to be insolvent, and was immediately thereafter closed, and a receiver appointed. *Held*, that the action of the stockholders in reducing the amount of the increase was legal, and that of the comptroller in approving the increase under the circumstances was proper; that the subscribers became stockholders, and had no equitable ground upon which to repudiate their liability as such to the creditors of the bank.

6. SAME.

A subscriber to an issue of increased stock authorized by a national bank, who was given original stock instead, which fact appeared on the face of the certificate and by the books of the bank, who retains such stock, without objection, for three years, and until after the bank has become insolvent, will be presumed to have known and assented to such change, and is precluded from thereafter asking to be relieved from liability as a stockholder on that ground.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

99 F.—51

This is a suit in equity, brought by Philip Tillinghast, as receiver of the Columbia National Bank of Tacoma, in the state of Washington, an association organized under the national banking act, against 46 defendants, sued as stockholders, for the purpose of recovering an assessment of $61 per share of the stock held by them, levied by the comptroller of the currency upon their personal liability on account thereof, imposed by section 5151 of the Revised Statutes of the United States. The material facts as developed by the pleadings and proofs are as follows:

The Columbia National Bank of Tacoma, Wash., was organized on the 2d day of September, 1891, with a capital stock of $200,000, and thereupon engaged in the banking business at that place. On the 12th day of January, 1892, at the regular annual meeting of the shareholders, by a two-thirds vote, the said shareholders resolved to increase the capital stock of the association in the sum of $300,000. The resolution passed for that purpose was as follows: "(1) Resolved, that under the provisions of the act of May 1, 1886, the capital stock of this association be increased in the sum of three hundred thousand dollars ($300,000), making the total capital five hundred thousand dollars ($500,000). Further resolved, that, as money paid in amounts to fifty thousand dollars ($50,000), or more, the president or cashier be authorized to certify the same to the comptroller of the currency, and shall so continue to certify until the said three hundred thousand dollars ($300,000) is paid in." Thereupon notice was given to each shareholder of the association, granting the privilege to each of them of subscribing for such number of shares of the proposed increase of the capital stock as such shareholder was entitled to, according to the number of shares owned by him before the stock was voted to be increased. The shareholders having failed to subscribe for such increase, the books of the association were opened for subscription, and, among others, the defendants subscribed for certain shares of the increased stock, and paid for their subscriptions. Certificates of stock for the amount subscribed by them, respectively, were issued, and received by them, and their names were entered as shareholders in the stock book and ledger of the association. The whole amount of stock so subscribed by the defendants and others, and paid for, amounted to the sum of $150,000. The bank included this stock in its statements published, in accordance with the banking act, as "capital stock paid in not certified"; and dividends were paid by the association in the same manner and to the same extent as dividends upon the original capital stock of the said association, to the defendants among the rest. This $150,000 of stock had all been taken and paid for by the last day of July, 1892, but was not certified to the comptroller as fast as $50,000 thereof was subscribed and paid for; nor was any certificate of the increased stock certified to the comptroller until the 9th day of September, 1895, when two-thirds of the shareholders of the said association, acting with the approval of the comptroller of the currency, and at a meeting called for the purpose, voted to modify the said increase of stock of $300,000 by just one-half, making it only $150,000, and the total amount of capital stock, original and increased, $350,000, instead of $500,000. Soon after this the officers of the association certified to the comptroller the fact of said increase of $150,000, and that it had been fully paid. On the 23d day of October, 1895, the comptroller certified in due form that the capital stock of the association had been increased in the sum of $150,000, that that sum had been paid in, and that he approved of such increase. With this certificate the comptroller transmitted the following explanatory letter:

"Mr. W. G. Peters, Cashier, Columbia National Bank, Tacoma, Wash.— Sir: Inclosed herewith you will find my certificate, approving the increase of the capital stock of your association from $200,000 to $350,000, with letter to that effect. In connection with these papers, I desire to inform you of my reasons for approving this increase of capital stock. On investigation it appears that a meeting of the shareholders of the Columbia National Bank was held January 12, 1892, at which 1,429 of the 2,000 shares of stock were represented, 1,394 of which were voted in favor of increasing the capital stock. Subsequently, subscriptions to the increased stock were taken to the amount of $150,000, and this amount has been certified by the officers of the bank as having been paid in as permanent capital, their certificates to this effect

being dated July 25, 1895. In the meantime it appears that the subscribers to the increased stock have received the same dividends as the other shareholders since the time their money was paid into the bank as capital stock, and that no effort appears to have been made by them to have the increase of capital stock certified to this office in order that the comptroller's certificate of approval might be obtained, and no complaints appear to have been made by them because of this delay, so long as the bank remained in fairly good condition. The published reports of condition of the bank have advertised the amount paid in for increased capital stock as 'uncertified capital,' holding out to the public that the certified capital of the bank, namely, $200,000, had been increased by the amount so published, to which the new shareholders tacitly consented. It must necessarily follow that the patrons of the bank have considered this 'uncertified capital' as a part of the permanent capital of the bank, and have made their deposits with faith in this belief; hence, if the bank should at any time in the future become unable to continue business, it would not appear in any way equitable that the subscribers to the increased capital stock should be put upon the same footing with the innocent depositors, who have relied upon the credit of the bank as maintained by its published reports of condition. For these reasons I have determined that it is my duty to approve the increase of capital stock in the amount certified by the officers of the bank as having been paid.

"[Signed] Very respectfully, James H. Eckels, Comptroller."

When, on September 9, 1895, the above-mentioned modification was resolved upon by the shareholders, the affairs of the bank had become critically involved, and in fact the institution was insolvent. On August 27, 1895, the defendant Bailey, in behalf of himself and the other defendants, addressed a letter to the comptroller, protesting against any increase in the sum of $150,000, which had been subscribed, to which letter the comptroller replied as follows: "You are respectfully informed that on August 5th the representative of the bank referred to was advised that, in view of the fact that the whole amount applied for had not been paid in, my certificate authorizing increase of the capital stock of the bank would not be issued, as per shareholders' resolution of January, 1892." On the 9th day of August, 1895, the comptroller addressed a letter to the cashier of the bank, in which he stated that he would approve of an increase in the sum of $150,000, upon certain conditions, which were that a meeting of the shareholders be called for the purpose of considering the question of increasing the capital stock, the notice to said shareholders stating specifically that the matter of increasing such stock in the sum of $150,000 should be considered at such meeting, and upon further condition that a two-thirds vote of the shareholders should be given in favor of such increase, and the legal requirements in reference thereto were fully complied with. It was in pursuance of this letter that the stockholders' meeting of September 9, 1895, was held, at which the modification of the increase of capital stock was determined upon by the shareholders. On the 24th day of October—which was the day after the comptroller had approved the increase of the capital stock of the bank in the sum of $150,000, he (the comptroller) directed a national bank examiner to close the doors of said bank, presumably on account of its insolvency, and a receiver was appointed.

Certain other incidental facts are referred to in the course of the opinion which follows, in connection with the questions therein discussed. All the defendants demurred to the bill upon the ground that no sufficient basis for equitable relief was therein shown against defendants, or any of them; and some of them, more specifically, upon the ground "that the relief sought is not of equitable cognizance, because it appears upon the face of the bill that complainant had a plain and adequate remedy at law." The defendants filed a cross bill, wherein, upon the ground of matters already stated, and certain other facts hereinafter referred to, they prayed that the comptroller's certificate authorizing the increase of capital stock by $150,000, of September 9, 1895, should be decreed to be "wholly null and void, as made without jurisdiction or authority, and that complainant be enjoined from asserting any claim against the respondents under or by virtue thereof." The demurrers to the original bill were overruled, Judge Taft presiding. The defendants answered, and a replication was filed. Complainant in the original bill answered the

cross bill, and complainants therein filed a replication, and proofs were taken. Judge Clark, who presided in the circuit court on the final hearing, passed a decree for the .complainant. His opinion is reported in 86 Fed. 46. The defendants have appealed.

F. G. Roelker, F. B. James, John C. Healy, Oscar F. Davisson, and John Ledyard Lincoln, for appellants.

Philip Tillinghast, pro se.

Before LURTON, Circuit Judge, and SEVERENS and THOMPSON, District Judges.

SEVERENS, District Judge, after having stated the case as above, delivered the opinion of the court.

The first question arising upon this record is whether the complainant has chosen the proper forum in which to enforce the individual liability of the defendants as stockholders to the creditors of the bank in excess of their liability to the corporation for the stock itself, and, in connection with this, the related question whether the defendants were properly joined, all in one suit. In behalf of the defendants it is earnestly insisted: First, that there was a complete and adequate remedy at law; and, second, that, if they could properly be sued in equity, inasmuch as they are liable, if at all, not jointly, but severally only, there is no warrant for suing them collectively. In support of the first of these contentions, namely, that the remedy at law was adequate, it is pointed out that as to each defendant the question of liability and the amount to be recovered (if that is open to contest) could be readily ascertained by the ordinary methods of trial in an action at law; that the demand is simply for a judgment for a sum of money; and, further, that there is no fact or circumstance of an equitable character involved. In the case of Kennedy v. Gibson, 8 Wall. 498, 19 L. Ed. 476, which arose not long after the national banking act went into operation, suit was brought by bill in equity against several stockholders of a national bank by a receiver to recover the maximum amount of their special liability. The bill showed facts indicating the necessity for enforcing it to that extent, but did not show that the comptroller had made any determination of that matter, or given any direction for enforcing this liability of the stockholders. The defendants demurred, and the demurrer was sustained. What the grounds of the demurrer were is not stated in the report, but the reporter tells us that the case was decided in the court below mainly upon the ground that the bill failed to aver that the comptroller had taken any action in the matter. The supreme court held that such a determination by the comptroller was a condition precedent to the right of the receiver to bring suit against stockholders to enforce their liability in excess of their stock; and it seems clearly inferable that the court also held that, when the suit was for the whole amount of the liability, it must be at law. Other matters were discussed and decided in the opinion of the court delivered by Mr. Justice Swayne, not relevant to the present inquiry. But in the course of the opinion, after laying down the proposition that, "when the whole amount is sought to be recovered, the proceeding must be at law," it is said: "Where less is required, the proceeding may be

in equity, and in such case an interlocutory decree may be taken for contribution, and the case may stand over for the further action of the court, if such action should prove to be necessary, until the full amount of the liability is exhausted." This, it is now said, was a dictum merely; and undoubtedly it was such in the sense that it was not necessary to the determination of the case. But it is to be observed that—apparently with the sanction of the court—Mr. Justice Swayne was outlining the proceedings appropriate to the enforcement of this special liability of stockholders. If so, this statement of the rule is of more weight than is ordinarily attached to a mere dictum. The case has been referred to many times since, and its rulings approved in general terms by the supreme court, and there has never been any dissent from the announcement of the particular rule now under consideration. Casey v. Galli, 94 U. S. 673, 42 L. Ed. 178, and U. S. v. Knox, 102 U. S. 422, 26 L. Ed. 216, were two of such cases decided shortly after, and in the latter case the court expressly says that it approves and reaffirms the "rule laid down" in Kennedy v. Gibson and Casey v. Galli. No particular rule is mentioned, and we think it probable that it was meant to affirm generally the law "laid down" in the previous opinions. Beyond doubt the ruling that, where the whole amount of the liability is sought to be recovered, the suit must be at law, was based upon the fact that in such a case the remedy at law is adequate, and, under the provision of section 723, Rev. St., the action must be brought there, and then the stockholder would be given the privilege of a trial by jury. The proposition that, where less is required, the proceeding might be in equity, is apparently made to rest upon the implication that, as the liability would not thereby be exhausted, and further proceedings might be necessary, it would accord with the principles and practice of courts of equity that, the question of liability being once determined by decree, no new suit would be necessary, but the remnant of liability could be enforced by supplementary proceedings, one or more, and thus would be promoted one of the objects of equity in avoiding a multiplicity of suits. It is said that in such case the proceeding "may" be in equity. The implication is that it might also be at law, and this seems to give further color for the interpretation which we think the other language employed fairly imports. Further reasons might be given for according a remedy in equity in such cases. The liability of the stockholder is in the nature of a trust fund. The proceeds retain that character in the hands of the receiver for the benefit of creditors. The collection of the assessment does not finally deprive the stockholder of the sum collected. It is provisional only. The comptroller is, by the consent of the stockholder, appointed for the purpose of determining whether contribution should be made, and, by approximation, in what amount. In most instances the first assessment can only be an approximation. But in the end, if the stockholder has been required to advance more than his proportion of the amount necessary to pay creditors in the ratio of the stock he holds to the whole of the capital stock, it is refunded to him.

Again, while the stockholder is not concerned with the collection made from other stockholders, yet he is concerned in the question

whether the others are in fact stockholders, for the measure of his own liability will depend upon that. By a determination that some stock which has been counted by the comptroller as the basis of his assessment is not valid stock, and so not assessable, his own share must eventually be increased. Indeed, in the present case some of the defendants on various grounds are seeking by cross bill, alleging frauds and circumventions practiced on them, to exonerate themselves from the character and liability of stockholders. The receiver, so far as this attempt is concerned, represents all the other stockholders who are interested in retaining them. The facts that the receiver as the representative of the creditors is seeking to recover a trust fund, and that there is a complication of interest in the questions and matters involved, furnish additional grounds for holding that a bill in equity is an appropriate method of procedure wherein to litigate the matters in controversy. But it is not necessary to rest the equitable jurisdiction over the case upon that ground, for we are clearly of opinion that the bill should be maintained for the purpose of avoiding a multiplicity of suits. In considering this phase of the general question, the other point we have just considered is not material; that is to say, whether such a proceeding as this is an appropriate one, considered independently of the peculiar doctrine applicable under that branch of equity which includes its function for preventing a multiplicity of suits. For this latter purpose it is immaterial whether the suits to be avoided or prevented are of a legal or an equitable character. The object is the same in either case, and the reason for the proceeding is the same.

There is a common question in the case between the receiver and the defendants, namely, the question whether the latter were released from their stock subscription by the fact that, whereas the resolution for increasing the stock in the sum of $300,000 was that under which their subscription took place, yet subsequently, by proceedings to which they did not consent, the proposed increase was reduced to $150,000. The protest interposed by Bailey in behalf of himself and the other stockholders to the certification by the comptroller of the modified increase of the capital stock of the bank assumes that they stood on the common ground already stated. And these circumstances, namely, the great number of the parties on one side or the other, the identity of the question of law, and the similarity of the facts in the several controversies between the respective parties, are the basis on which the jurisdiction rests. The object is to minimize litigation, not only in the interest of the public, but also for the convenience and advantage of the parties. If the receiver was compelled to bring separate suits, it would entail a vast expense upon the fund in trying over and over again the identical questions of law and fact with each stockholder, and with no substantial advantage to him, but injury, rather, in the increased cost in the immediate suit, and the larger burden upon the fund, created by the many suits against the others.

Nor is it necessary, as counsel seem to suppose, that there should be any privity of interest between the stockholders, other than that in the question involved and the kind of relief sought, the right of

their claims being common to them all, in order to bring the case within the jurisdiction. In several of the early cases of this class which established and confirmed this ground of equity no such requirement was made, and no such fact existed. Mayor of York v. Pilkington, 1 Atk. 282; Lord Tenham v. Herbert, 2 Atk. 483; City of London v. Perkins, 3 Brown, Parl. Cas. 602; New River Co. v. Graves, 2 Vern. 431. In the origin of its establishment the jurisdiction was most frequently illustrated upon "bills of peace," so called, but, as time has gone on, experience has proved the utility of this doctrine of equity, and its application has been broadened and extended to a great variety of subjects and conditions to which it is found profitably applicable. A near-by case is that of Louisville, N. A. & C. Ry. Co. v. Ohio Val. Imp. & C. Co. (C. C.) 57 Fed. 42, where it was held that a railroad company whose guaranty had been indorsed upon the bonds of another company, without authority, as it was claimed, might maintain a bill in equity against the holders thereof to cancel the guaranty on the ground of preventing a multiplicity of suits, although it might have a good defense at law to each of the bonds. Other authorities there cited, and which are pertinent also to the present inquiry, are Railway Co. v. Schuyler, 17 N. Y. 592; Supervisors v. Deyoe, 77 N. Y. 219; Black v. Shreeve, 7 N. J. Eq. 440; Waterworks v. Yeomans, 2 Ch. App. 11; and Pom. Eq. Jur. §§ 222, 911, et seq. The cases in which a like principle is recognized and applied are too numerous for citation. Many of them are collected in Pomeroy's Equity Jurisprudence in the notes to the sections referred to. It is true there are occasional cases where it seems to have been supposed that there must be some community of interest,—some tie between the individuals who make up the great number; but the great weight of authority is to the contrary, and there is a multitude of cases which either in terms deny the necessity of such a fact or ignore it by granting relief where the fact did not exist. And, indeed, it is difficult to find any reason why it should be thought necessary. It has no relevancy to the principle or purpose of the doctrine itself, which stands not merely as a makeweight when other equities are present, but as an independent and substantive ground of jurisdiction.

Upon the merits of the controversy it is contended, first, that at the meeting of stockholders on January 12, 1892, the resolution for an increase of stock in the sum of $300,000 was not legally passed, for the reason that the requisite two-thirds of the stock, which had been in form issued was not valid by reason of certain alleged frauds and irregularities in the issuance thereof; such, for instance, as that 1,700 of the 2,000 shares were originally taken out by parties who never intended to pay for them, and were not expected to do so, and that it was finally arranged that other parties should take and pay for them, which was afterwards done. Objections of much the same character are urged against the validity of the vote to modify the increase to $150,000, on the 9th day of September, 1895. All such grounds of defense may be considered and disposed of together. In the first place, it is altogether incompatible with the policy and purposes for which these banking associations are

created and allowed to do business that mere irregularities, or even fraudulent practices, in organization or management, should wholly invalidate the exercise of their vital functions, and give ground for a stockholder to repudiate his obligations to the public. There would be no security in doing business with such institutions. If such business was done at the peril of being undermined and invalidated by the development and maintenance of such defenses, it would destroy public confidence, and the business would come to an end. The stability of the bank's organization and the integrity of its maintenance and operations must be assumed in favor of the public as against the stockholder. If the conditions exist which the law prescribes for its existence and the transaction of business, that is enough, so far as the public is concerned. It is not meant to say that irregularities may not occur so gross as to authorize the stockholder to intervene, and apply to the proper tribunals for correction; but in that case the proceeding must be promptly taken, and not delayed until the rights of others have become involved in business entered upon with the presumption that the ground is clear, or that, if irregularities have occurred, they have been condoned. But, second, questions such as these are not left open to controversy. The comptroller's certificate upon which the bank is allowed to begin business, and his further certificate approving an increase or reduction of the capital stock, are conclusive evidence of all facts which he is required to ascertain before the issuance thereof. These facts cover all that is essential to authorize the bank to begin, and go forward with the character and functions it is allowed to assume. Among these facts are that the capital stock has been lawfully subscribed, and, in the case of an increase, that the increase has been regularly created, and that it has been paid in. The purposes of the act in providing for and making necessary the comptroller's certificate are that he shall make inquiry, and determine the existence of these essential facts; and make record evidence, upon which the public may rely, that the required conditions do in fact exist. The conclusiveness of the comptroller's certificate is not now open to dispute. It is settled by repeated decisions upon the most satisfactory grounds. Casey v. Galli, 94 U. S. 673, 42 L. Ed. 178; Chubb v. Upton, 95 U. S. 665, 24 L. Ed. 523; McCormick v. Bank, 165 U. S. 538, 17 Sup. Ct. 433, 436, 41 L. Ed. 817; Bank v. Mathews, 29 C. C. A. 491, 85 Fed. 934; Brown v. Tillinghast, 35 C. C. A. 323, 93 Fed. 326. Equally conclusive is the comptroller's certificate in respect of the amount for which an assessment shall be made on account of the special liability of the stockholders. He is put in that position of authority by the act; and the stockholder, when he takes stock, agrees that he shall act and decide upon the necessity for calling in the requisite sum, and how much is necessary. It is not the case of a liability imposed subsequently to the stockholder's subscription. The privilege is given him and his associates, upon complying with and assenting to the provisions which are enacted for safeguarding his own and the public interest, to engage in the business. The comptroller is authorized to determine what sum shall be advanced, and

the stockholder is bound to comply. He will get it back if it is not used. It cannot be diverted to any other purpose than the satisfaction of his personal liability. But, while the comptroller's certificates are conclusive in regard to the status of the bank and the necessity for an assessment, they do not foreclose the question as to who are the owners of stock. It is still open to one sued as such to say that he never was a stockholder, for in that case he has not come into the compact, and has not submitted to the obligations imposed by the statute; but in this collateral way he can take no advantage from any alleged infirmity of the association arising from irregularities or the nonexistence of facts which the comptroller, in the exercise of the authority vested in him, has found and certified.

We come, then, to the question whether the defendants became stockholders by reason of the transactions between themselves and the association, the resolutions relating to the increase of stock, and the approval of the final action of the stockholders in that regard by the comptroller. We entertain no doubt that they did. They subscribed, paid for, and received certificates therefor. Their names were entered in the stock books of the association, and the stock was held out to the public as having been taken. They received dividends upon it, and, so far as appears, were accorded all the rights of stockholders. These relations continued for more than three years, and until a time when the prospects of the bank darkened, without dissent either from their relation as stockholders or the conduct of the bank. They then demanded that the comptroller should abstain from making the formal certificate which should make their standing regular. It is insisted in behalf of the defendants that the comptroller's action in thus bringing them in when the association had become insolvent, and the consequence of doing it being to cast an extraordinary burden upon them, was a fraud; and it is pointed out that the very next day after the comptroller gave his certificate of increase and brought the defendants in, he closed the doors of the bank. We can find no evidence of fraud in what was done by the comptroller. Upon general principles, and independent of the special requirements of the national banking act, we think no one would hesitate to say that a party who had taken up and continued for so long a time the relation of a de facto stockholder, enjoying the privileges and having the chances accruing from the relation, should be held estopped from denying his position; that it would be a fraud upon those who had become the creditors of the bank for him to disown the obligations which belonged to the character he had assumed. If the comptroller had the power to give their holding the stamp of regularity, there was certainly nothing inequitable in his exercising it in the manner he did. It is urged that he thus compelled the defendants to come into a different contract from that which they had made; but we think not. The provisions of the act entered into their subscription of stock. The subscribers took it in contemplation of all that might lawfully happen to the bank, or be done by it. By a two-thirds vote the association was empowered to increase or reduce its capital stock, and, after having voted an increase, it had power to lessen

such increase, and to certify to the comptroller the increase, as thus modified, for his certificate sanctioning it. In our opinion, the rulings of the supreme court in the Pacific Bank Cases (Delano v. Butler, 118 U. S. 634, 7 Sup. Ct. 39, 30 L. Ed. 260; Aspinwall v. Butler, 133 U. S. 595, 10 Sup. Ct. 417, 33 L. Ed. 779; Thayer v. Butler, 141 U. S. 234, 11 Sup. Ct. 987, 35 L. Ed. 711) are practically decisive upon this point. Counsel for the defendants, for the purpose of distinguishing those cases, refer to the fact that in the records on which they were decided it appeared that a by-law of the association authorized the directors to dispose of the unsubscribed stock of the increase, but we do not think that was taken as an essential ground of decision. The reasoning of the court leads to the conclusion reached independently of that circumstance. The power of the association at all times to increase or diminish its capital with the approval of the comptroller includes the power there delegated to the directors. The by-law merely regulated the exercise of the power. When, therefore, the comptroller certified the increase of $150,-000, precisely the same thing happened as if the original vote had fixed the increase at that sum. The comptroller found that the proceedings for the increase had been according to law, and that it had been subscribed and paid in; and these things the defendants cannot deny. The fact that the subscription and payment for the stock of increase preceded the final vote of the stockholders to make the increase is not important. Precisely that condition of things existed in the Pacific Bank Cases, and it is worthy of note that there, as here, the vote to accept the smaller amount of increase took place after the bank became insolvent, and on the eve of its final collapse.

It seems proper in this connection to note that in the case of Bank v. Eaton, 141 U. S. 227, 11 Sup. Ct. 984, 35 L. Ed. 702, the decision in the same case in 144 Mass. 260, 10 N. E. 844, upon which Judge Jackson so much relied in making some of his observations in Winter v. Armstrong (C. C.) 37 Fed. 508, was reversed. As, however, in Winter v. Armstrong, the proposed increase never received the approval of the comptroller, there is no occasion to criticise the conclusion reached by the learned judge in that case. We think, therefore, that there is nothing in the action of the comptroller which was either irregular or wrongful to the defendants. Complaint is made that the notice given to the stockholders of the meeting of September 9, 1895, was not long enough, and that the defendants were not notified at all. We have already considered the effect of such irregularities as the first of these, and, as to the second, it may be added that, as their standing as stockholders was not complete, they were not entitled to vote, and notice to them was not required. Besides, they were repudiating the claim to be stockholders, and claimed to be creditors of the bank for the amounts they had paid, and that they could not "be considered as stockholders until the whole amount of stock (meaning the $300,000) had been subscribed and paid in." Referring to the comptroller's letter to Bailey of September 4, 1895, it is to be observed that it imported no more than that he would not approve of the increase of $300,000, voted on January 12, 1892, for the reason it had not been paid in;

and in no wise impugns his subsequent action in approving an increase of $150,000, which had been paid in, when the association accepted that increase, and requested his approval. Besides, the comptroller would not be precluded in his final authoritative action by an informal communication of this kind. He could not thus disable himself.

In behalf of the defendants William A. Groneweg and Louis Groneweg it is insisted that they should not be held as stockholders, because, as is said, they subscribed for stock of the increase, and were given original stock instead. The certificates issued to them did not denote that they were for the increased stock, as was the case with that issued to the others. It is probable that the difference was not regarded as material by them, though, if they were not satisfied, they would doubtless have been entitled to demand the kind of stock they had subscribed for. They gave proxies to vote on their stock, and this could only be done upon the assumption that it was original stock. The question is more difficult than that which the position of the other stockholders involves, but we are inclined to the opinion that, having regard to the presumption of knowledge on the part of stockholders of that which appears upon the face of the books of their corporation, and their long-continued acquiescence in their relation as stockholders without investigation, precludes them from now asking to be relieved. There are circumstances in which the association may become the owner and have the right to dispose of its original stock, and, in the absence of proof to the contrary, we must infer that the transfer to these defendants, the Gronewegs, gave them a good title to the stock. The stock then had value. Perhaps there was ground for them to have proceeded in equity, if they had done so seasonably, to rescind upon the ground of mistake, and tender back the stock; but it is doubtful whether they can at this late day claim such right. The evidence leaves the question whether the Gronewegs have not in fact known all along the character of their stock in doubt, but we do not determine how that was, for we are of the opinion that with reasonable diligence they should have known it, and that it may be fairly imputed to them that they did know it. See Rand v. Bank, 36 C. C. A. 292, 94 Fed. 349.

Several cases have arisen and been decided in other circuits involving similar subscriptions to this increase of stock in the Columbia National Bank, and similar results have been reached in all of them. The cases of Bank v. Mathews, 29 C. C. A. 491, 85 Fed. 934, and Brown v. Tillinghast, were decided by the circuit court of appeals in the Ninth circuit. It was there held that the clause in the resolution of the shareholders of January 12, 1892, that as often as $50,000 of the proposed increase of $300,000 should be subscribed for and paid in it should be certified to the comptroller, should be construed as contemplating that the increase should be made by installments of $50,000, or multiples thereof, and that the approval of the comptroller should be obtained from time to time. We are not to be understood as dissenting from that view, although there is reason for thinking that the officials of the bank did not so under-

stand it, and it would have been a rather unusual method of proceeding. But it is difficult to make out what other purpose there could have been, unless it was that the bank might thereby gain a better standing with the public, or, possibly, that the new subscriptions would be more securely tied. Being of opinion that the decree of the court below should be sustained upon the general grounds we have indicated, we have preferred to rest our opinion upon them, rather than upon the construction of the clause of the resolution in question. Our conclusion is that the decree of the circuit court should be affirmed.